[No. 7465-0-III. Division Three. March 3, 1987.]

THE DEPARTMENT OF LICENSING, *Appellant*, v. RUSSELL K. SHEEKS, *Respondent*.

---

Kenneth O. Eikenberry, Attorney General, and William C. Dodge, Assistant, for appellant.

John C. Cooney, for respondent.

THOMPSON, J.—Russell Sheeks' driver's license was revoked for refusing to take a Breathalyzer test after his arrest for driving under the influence of alcohol. The trial court reinstated his license, finding he was suffering from hypothermia rather than the effects of alcohol when he refused the Breathalyzer test, which caused him to be confused so that he did not understand the implied consent warning. The Department of Licensing appeals the reinstatement of Mr. Sheeks' driver's license. We reverse.

On December 23, 1983, at about 11:30 p.m., Russell Sheeks was stopped by Washington State Trooper Curtis Miller after Trooper Miller observed Mr. Sheeks driving erratically. Trooper Miller testified Mr. Sheeks staggered, leaned against his vehicle, had bloodshot and watery eyes, slurred his speech, and smelled of alcohol. Trooper Miller had Mr. Sheeks perform four sobriety tests and, based on his performance and the other indicators, concluded Mr. Sheeks had been driving under the influence of alcohol. Mr. Sheeks was placed under arrest at that time and transported to the Washington State Patrol office. At the patrol office, Trooper Miller advised Mr. Sheeks of his constitutional rights, at which time Mr. Sheeks was allowed to call

his attorney. Thereafter, Trooper Miller read Mr. Sheeks the implied consent warning and asked him to submit to a chemical test of his breath. Mr. Sheeks, according to the trooper, then stated he was refusing the test on the advice of his attorney. Mr. Sheeks testified he remembered the trooper warning him: "This is it or you go to jail", in the context of discussing the machine's accuracy. The trooper further testified that Mr. Sheeks did not indicate he lacked understanding of the warning given to him that his driver's license would be revoked if he refused to take the test. Mr. Sheeks was released and left the patrol office, waiting outside in the cold until his ride arrived. Weather that night was extremely cold, being approximately 41 degrees below zero, taking into account the wind chill factor. Mr. Sheeks was wearing a sport coat but no overcoat, and he testified the heater in his car had not been working prior to his being stopped.

Trooper Miller sent his sworn report to the Department of Licensing attesting to Mr. Sheeks' refusal to submit to the Breathalyzer test. The Department revoked Mr. Sheeks' driver's license for 1 year pursuant to RCW 46.20-.308. The Department's action was affirmed at an administrative hearing. Mr. Sheeks appealed to superior court, which reversed the Department's decision and reinstated Mr. Sheeks' driving privileges.

The issues are whether the trial court erred in finding that Mr. Sheeks was suffering from hypothermia rather than the effects of alcohol on the night in question; whether Mr. Sheeks was confused at the time he was given the implied consent warnings; and whether the trooper knew or should have known Mr. Sheeks was confused at the time the implied consent warnings were given. The Department of Licensing contends the evidence does not support the court's findings nor does it support the conclusions that Mr. Sheeks' license revocation should be set aside and his driving privileges reinstated. The Department assigns error to the findings that:

## VIII

Based on the expert testimony of Richard Elston, M.D., more likely than not, Russell K. Sheeks was suffering from hypothermia rather than the [e]ffects of alcohol.

## . . .
## XIII

At the time Russell K. Sheeks was given the implied consent warning he was confused and did not understand that warning.

## XIV

Trooper Miller knew or should have known that Russell K. Sheeks was confused at the time the implied consent warning was given because of the length of time Petitioner was out in the –40 degree weather and because Petiti[o]ner was skimp[i]ly clad at that time.

■■ RCW 46.20.308 directs the Department to revoke a person's license or permit to drive if it receives a sworn report from a law enforcement officer that an arrested DWI suspect has refused to submit to a chemical test of his breath after being informed his refusal will result in revocation of his privilege to drive. RCW 46.20.308 also provides that any person who operates a motor vehicle within this state is deemed to have given consent to a chemical test to determine the alcohol content of his blood. The statute will allow a person to withdraw his preimposed consent by refusing to take the test after being fully advised of the consequences. *Strand v. Department of Motor Vehicles,* 8 Wn. App. 877, 881, 509 P.2d 999 (1973). The statute contemplates that drivers will be given an opportunity to make a knowing and intelligent decision whether to take the test. *Schoultz v. Department of Motor Vehicles,* 89 Wn.2d 664, 669, 574 P.2d 1167 (1978). If a driver explicitly exhibits his lack of understanding or confusion regarding the information given, the officer must clarify that information. A driver has the burden of showing his confusion was apparent to the officer and that he was thereafter denied clarification. *Strand,* at 883.

Our review is limited to whether substantial evidence supports the trial court's findings and whether those find-

ings support the conclusions of law and judgment. *Group Health Coop. of Puget Sound, Inc. v. Department of Rev.,* 106 Wn.2d 391, 397, 722 P.2d 787 (1986). Substantial evidence is evidence in sufficient quantum to persuade a fair-minded person of the truth of the declared premise. *Nichols Hills Bank v. McCool,* 104 Wn.2d 78, 82, 701 P.2d 1114 (1985).

The controlling issue is whether Mr. Sheeks met his burden of showing he was confused. We have examined the record and conclude there is not sufficient evidence to support the trial court's findings. In conducting this review, we have been careful to do no more than search for the presence of evidence and not to weigh it or evaluate credibility. We recognize determinations of credibility and weight are within the province of the trier of fact, which this court is not.

Dr. Elston was called by defendant as an expert witness. He was asked to describe the symptoms a person would exhibit if, for 10 to 20 minutes, he was out in 41 degrees below zero weather, clothed in a light sport coat rather than an overcoat. The doctor then described cold injury as classified into two categories. One would be the effect of the cold on hands and feet, numbness, peripheral vascular insufficiency progressing possibly to misuse of the limbs, and possibly even gangrene. The second category would be effects resulting in the dropping of central body temperature with symptoms of shivering or tremors of the body, including hands, feet, mouth and lips. With the shivering there is some slurring of speech which affects a person's ability to express himself. He then went on to state that a person out in this extreme weather in light clothing would more likely than not suffer some of the described symptoms. On cross examination, he further elaborated on the effects of extreme cold on a person who was wet. He also stated hypothermia involved a progression of stages which can eventually result in death. We find nowhere in the record testimony by Dr. Elston that all persons suffering from some of the symptoms of hypothermia will be con-

fused. There is no testimony at which point in the progression of stages a person subjected to extreme cold will become confused. There was no testimony of any symptoms visible to the observer that would indicate a person suffering from the cold was confused. In short, his testimony fell far short of being of benefit to the trier of fact to determine one way or the other whether Mr. Sheeks was suffering from hypothermia to the extent that he was confused and, if he was confused, what symptoms would evidence that confusion. Finally, no mention was made by Dr. Elston as to the effects of alcohol in masking or exacerbating symptoms of hypothermia.

The record is replete with references to the extreme cold and that Mr. Sheeks was exposed to it both while he was driving his car before being stopped, and for an additional 10 to 20 minutes before he was taken to the patrol station. In addition, the friend who picked Mr. Sheeks up at the patrol station described Mr. Sheeks as shivering, rambling and incoherent in his speech. Mr. Sheeks had been waiting outside for his ride. Mr. Sheeks testified that he was shaking and had never been so cold in his life. He said he could not recall the details of his conversation with his attorney. However, there is nothing in the record to indicate that while Mr. Sheeks was in the presence of Trooper Miller, Trooper Miller had any indication that Mr. Sheeks was incoherent or confused. Mr. Sheeks does not contend he told the trooper he was confused, nor in testimony or argument does he direct the court's attention to any specific indicia of confusion evident to the trooper on the night in question.

We conclude there is insufficient evidence to support the trial court's finding that Mr. Sheeks was confused at the time he was read his implied consent warnings. A finding of fact which is without any support in the record cannot stand. *Worthington v. Worthington,* 73 Wn.2d 759, 440 P.2d 478 (1968); *Guard v. Friday Harbor,* 22 Wn. App. 758, 592 P.2d 652 (1979). Nor is there any evidence in the record that Mr. Sheeks, when advised of his implied consent

warnings, clearly manifested confusion to Trooper Miller and was denied clarification. A lack of understanding not made apparent to an officer is of no consequence. *Strand,* at 878, 883. It may be argued that this case is distinguishable on its facts from *Strand* since, in this case, the trial judge found the trooper knew or should have known Mr. Sheeks was confused. The implication of this finding is that since Mr. Sheeks was exposed to severe cold for an appreciable period of time, the trooper should have inferred he was confused from this fact alone. There is nothing in the record that would support the court making such a conclusion. There is an appreciable gap between the expert and lay testimony and the court's conclusion Trooper Miller knew or should have know Mr. Sheeks was confused.

This court can conceive of some facts which, when proven, would justify a conclusion that a driver was confused without specific testimony to that effect. For example, if it were proved a suspect were deaf or could not understand English or was severely retarded, and if such a fact were known to the officer, it could be reasonably concluded he should know the suspect might be confused by implied consent warnings. But no such inference will logically follow from exposure to cold without more. In summary, we conclude there was nothing in the record that would support the trial court's finding either (1) that Mr. Sheeks was in fact confused and therefore did not understand the implied consent warnings, or (2) that the fact Mr. Sheeks was shivering and had been subjected to extreme cold was sufficient to support a finding the trooper knew or should have known Mr. Sheeks was confused.

It should be noted that there are varying degrees of confusion. A word may be misunderstood or a driver might not hear a person clearly, resulting in momentary confusion about what is being said. Momentary misunderstanding or culpable confusion on the part of the driver will not excuse refusal to take a Breathalyzer test. The confusion sufficient to excuse a driver's refusal to take the breath test must be so pervasive and so extreme that the driver is unable to

make a knowing and intelligent decision as to whether or not to take the test. And as previously noted, even when a driver's confusion is actually apparent, a driver must show the officer denied clarification before his test refusal is justified. *Strand,* at 883.

In its oral opinion, the court did give some explanation as to why the court believed Mr. Sheeks was confused. If the required findings are not made or are inadequate, this court may go to the oral decision or the trial court's statement on the record to supplement the findings or clarify the basis on which the trial court decided the case. *In re LaBelle,* 107 Wn.2d 196, 728 P.2d 138 (1986); *Goodman v. Darden, Doman & Stafford Assocs.,* 100 Wn.2d 476, 481, 670 P.2d 648 (1983). After talking to his attorney, Mr. Sheeks had told the trooper he was refusing to take the test based on advice of counsel. The court stated he knew counsel and found it hard to believe he would give such advice, and therefore this was further evidence of Mr. Sheeks' confusion. However, no evidence was presented at trial that defense counsel did not so advise Mr. Sheeks, or that he would or would not have so advised a client. This is not a proper subject for judicial notice. Therefore, this reason is unsupported by the record.

In summary, although the evidence supports the finding that Mr. Sheeks may have been suffering from some of the effects of hypothermia, it does not support the conclusion he was therefore confused or that he was not affected by alcohol. Additionally, since there was no indication by word or act that Mr. Sheeks was confused or did not understand the warnings, the finding Trooper Miller knew or should have known he was confused is not supported by the evidence.

Reversed, and the decision of the Department of Licensing is reinstated.

GREEN, J., concurs.

McINTURFF, C.J. (dissenting)—The underlying issue concerns the role of an appellate court in reviewing a trial court's findings of fact and conclusions of law. This role was described by our Supreme Court in *State v. Black,* 100 Wn.2d 793, 802, 676 P.2d 963 (1984), when addressing an appeal by the State:

> most of the State's opening and reply briefs are dedicated to challenging the findings of fact as well as reinterpreting the evidence presented at trial. This court is not a trier of fact, however. Where there is substantial evidence to support the trial court's findings of fact, we will not disturb them on appeal. Even where the evidence conflicts, a reviewing court must determine only whether the evidence *most favorable* to the prevailing party supports the challenged findings. After reading the transcript of proceedings, we find that although we might have interpreted the evidence differently had we been the trier of fact, the trial court's findings of fact are supported by the evidence.

(Citations omitted. Italics mine.)

I agree with the majority that the question of confusion relates to the statutory intent that a driver be given an opportunity to make a knowing and intelligent decision whether to take the Breathalyzer test. *Schoultz v. Department of Motor Vehicles,* 89 Wn.2d 664, 668, 574 P.2d 1167 (1978). I also agree that the question of confusion is a question of fact. *Schoultz,* at 669. Where we disagree is on the application of the substantial evidence test to the findings of fact made by the Superior Court supporting its reinstatement of Mr. Sheeks' driver's license. Our court must not retry the evidence or substitute its judgment for that of the trial court. Since I believe this is what the majority has done, I dissent.

Under the guidance of *State v. Black, supra,* what evidence most favorable to the prevailing party, Mr. Sheeks, supports the trial court's findings of fact? Here, the trial court's finding that Russell Sheeks was more likely than not suffering from hypothermia, rather than the effects of alcohol, is supported by the expert testimony of Richard

Elston, M.D.[1] There is further testimony by Mr. Sheeks that he was shaking from the cold during the sobriety test and later at the station where the request to take the Breathalyzer was made.[2] Judge James Murphy testified that upon picking Mr. Sheeks up at the station (after Mr.

---

[1] Dr. Richard Elston testified:

"Q. During your career, have you ever had occasion to treat hypothermia?

"A. . . . yes I have.

"Q. Specifically, doctor, in a situation where it's a minus 41 degrees below zero with a wind chill factor, and a person had no overcoat on, but did have, say, a sports coat on, and had been exposed to this weather for some 10 to 20 minutes, in one form or another, more likely than not what symptoms would one possess or have after being in this type of a weather condition for a prolonged time, such as 10 or 20 minutes?

"A. Well, the way I feel about thermal injury or cold injury, . . . we would more or less be classified into two categories. One would be the [e]ffect of the cold on his hands and his feet, where we would suffer such things as numbness and peripheral vascular insufficiency, pr[o]gressing possibly to misuse of the limbs, and possibly even gang[rene]. The other effects in hypothermia I think of is a dropping of the core temperature, what we call the core temperature, which is the central body temperature. And with the symptoms of hypothermia, we usually initiate such things as a shivering or a tremor of the body would be—of the whole body. Probably of the hands and feet, as well as the mouth and lips in which we get a tremor or a trembling as the body shivers in an attempt to raise the core temperature. Following the shivering, which I can tell from my own personal experience, sometimes you get a numbness in one or more limbs, the arms or the feet, and if this progresses long enough why the body is just overcome with a tremendous shivering effort to raise the core temperature.

"Q. Doctor, what if any effect would hypothermia have on one's speech?

"A. Well, with shivering of course you could get some slurring of the speech and some effect in expressing yourself. As you try and raise your body temperature.

"Q. Do you have a professional opinion, based on your background and knowledge of hypothermia, if a person was out in this minus 41 degree weather, with a sports coat, but no overcoat or anything of that nature, for 10 to 20 minutes, would it be more likely than not that they would suffer some or all of the symptoms you described?

"A. It's more likely than not that they could suffer some of the effects of hypothermia."

[2] Russell Sheeks testified:

"Q. After you were pulled over, did you get out of the car?

"A. Yes, sir, I did.

"Q. What was your physical condition when you got out of the car?

"A. I was frozen. I just—I have never been so cold in my life. And . . .

". . .

Sheeks' refusal of the Breathalyzer), Mr. Sheeks was extremely cold, evidenced by shivering, and that his thoughts rambled.[3]

---

"Q. What was your physical condition at the time that you were trying to do these tests?

"A. I was just shaking. I had goose bumps, and I guess—well I'm not as coordinated as I would like. I've got a bad back anyway, and I was just shaking so badly that . . .

"Q. Have you ever been this cold before or since this event?

"A. Never, ever.

" . . .

"Q. Directing your attention to when you arrived at the station, do you recall who called me? Who dialed the phone?

"A. I believe the Trooper dialed the phone. He asked me who I wanted to call.

"Q. And when you got ahold of me, do you recall what I discussed with you?

"A. Frankly, I really don't. I, you know, at that point in time, you know it was kind of a—you know, you are pretty shook up. I was extremely cold and shaking. I was in a position that I didn't—you know, that wasn't a normal course of events for me, and I know I called you up to, you know, let you know what had happened.

" . . .

"Q. What was your state of mind at the substation?

"A. Again, as I think back, it just—my state of mind was that I was freezing. I was so cold that everywhere I went, even—it seems to me even—I couldn't warm up even in the substation. I was just—I was shaking, and I was kind of, you know, was just—you feel like, you know, you have never had a heart attack I suppose, and you see heart attacks and that sort of thing on the movies and you are so cold and you are shaking and you are having trouble breathing, and you know, I don't know, but my state of mind was that I just wanted to be warm. I wanted to, you know, I didn't feel well."

[3]Judge Murphy testified:

"Q. For the record, would you give Judge McLean your name and address?

"A. James M. Murphy, N. 6415 Catherine, Spokane, Washington.

"Q. And your occupation, sir?

"A. I am a Judge of the Spokane County District Court, currently presiding.

"Q. And how long have you been so employed?

"A. Seven and a half years.

" . . .

"Q. And did you go down to get Mr. Sheeks?

"A. I did.

"Q. Can you describe the—do you have a personal knowledge of what the temperature was with the wind chill factor?

"A. I don't with the wind chill factor. I know that when I picked Russ up, due to his physical state, I did note how cold it was because he was shivering so much. That the radio said it was in the teens. I can't remember exactly what, but it was something teen below zero at the time that I picked him up.

Some additional facts are relevant here on the extent of Mr. Sheeks' exposure to the cold. On the night in question, Mr. Sheeks had been visiting at his brother's new home on Brown's Mountain, south of Spokane. Mr. Sheeks arrived at his brother's house around 9 p.m. and left around 11 p.m. He had trouble starting his car and then the heater would not work. Mr. Sheeks was dressed in a sports coat, was wearing no overcoat, gloves, hat or boots. He had been driving in his unheated car for approximately 20 to 25 minutes when he stopped at the intersection of Sprague and Park; the trooper noticed his hesitancy on proceeding through a green light. It can be inferred the car was the temperature of the outside air since it had been parked approximately 2 hours at Mr. Sheeks' brother's house and the heater was not working. Mr. Sheeks explained that his hesitancy at the stop light was due to his efforts to get the car heater to work and the fact that he was lost because he had taken a wrong turn and was unfamiliar with the area of Spokane in which he was driving. After the trooper stopped him, Mr. Sheeks was out in the −40 degree weather (taking into consideration the wind chill factor) for an estimated 15 to 20 minutes performing sobriety tests.

Given these facts, the extreme cold on the evening of Mr. Sheeks' arrest, his skimpy clothing and the fact Mr. Sheeks' car heater did not work, there is substantial evidence to

---

". . .

"Q. Okay, what was Mr. Sheeks['] physical condition when you arrived there?

"A. Well, he was shivering, he shivered all the way home in the car. He kind of rambled when he talked, he was a bit incoherent in his speech. Uh, and he constantly talked about how cold he was, and he did shiver until I dropped him off at his home, and he was still shivering.

"Q. Did you have a coat on that evening?

"A. I did.

"Q. Did he have a coat on that evening?

"A. No.

". . .

"Q. Okay. But you do recall that he had a sport coat on of some kind.

"A. Yeah, because it was—that's probably the first thing I noticed because it was so cold, and he was standing outside when I picked him up, and he was just literally shaking, and he continued to shake."

support the trial court's finding Mr. Sheeks was more likely than not suffering from hypothermia rather than the effects of alcohol. This supported factual finding negates the argument Mr. Sheeks' confusion was due to voluntary intoxication.

The trial court further found Mr. Sheeks was confused at the time of the implied consent warnings and that Trooper Miller either knew or should have known Mr. Sheeks was confused because of the time he was out in the extreme cold and because he was skimpily clad. Again, this is a question of substantial evidence to support a finding of fact. *Group Health Coop. of Puget Sound, Inc. v. Department of Rev.*, 106 Wn.2d 391, 397, 722 P.2d 787 (1986); *State v. Black, supra.*

Mr. Sheeks' testimony as to state of mind at the substation indicates confusion: he did not recall what he had discussed in the telephone call to his attorney and he emphasized the continuing effects of exposure to cold on his physical and mental state. (See footnote 2.) Judge Murphy's testimony corroborates Mr. Sheeks' testimony of general mental confusion: "He kind of rambled when he talked, he was a bit incoherent in his speech." (See footnote 3.)

The majority finds Dr. Elston's testimony fell far short of being of benefit to the trier of fact in determining whether Mr. Sheeks was confused and, if he was, what symptoms would evidence that confusion. (Majority, at 70.) Here, it is important to remember the task on appeal is merely to determine if there is substantial evidence to support a finding of confusion. *Group Health,* at 397. Although it would be persuasive evidence if a medical expert testified that all persons suffering from hypothermia will become confused, such testimony is not needed under a substantial evidence test. The necessary showing of confusion is found in the record in the testimony of Mr. Sheeks and Judge Murphy. No more is required to meet the substantial evidence test. It was not necessary for Dr. Elston to compare the effects of alcohol to the effects of hypothermia or describe the effects of alcohol in masking or exacerbating

the symptoms of hypothermia. To so require is to go beyond the requirements of the substantial evidence test. The majority's statement assumes alcohol has the effect of masking or exacerbating the effect of hypothermia, but there is nothing in the record to support this conclusion. Further, Trooper Miller adequately described the symptoms of intoxication which led him to believe Mr. Sheeks was intoxicated: staggering, eyes bloodshot, speech slurred, odor of intoxicants. On the other hand, the expert's testimony provided the symptoms of hypothermia: shivering and tremor of the body, slurring of speech, misuse of limbs and numbness in the limbs. (See footnote 1.) Additionally, there was abundant evidence of the cold conditions, Mr. Sheeks' inadequate dress, his shivering and shaking and confusion, to support a conclusion of hypothermia. The descriptions of the symptoms of hypothermia and of intoxication were adequate to allow the trial judge to compare the symptoms and make a determination of whether Mr. Sheeks was intoxicated or suffering from hypothermia. This the court did, finding Mr. Sheeks was more probably than not suffering from hypothermia rather than the effects of alcohol.

Second, as the majority pointed out, *Strand v. Department of Motor Vehicles,* 8 Wn. App. 877, 883, 509 P.2d 999 (1973) held that if a driver explicitly exhibits his lack of understanding or confusion, the officer must clarify the information. If there is no clarification provided, the license of the driver may not be revoked on the ground that he refused the Breathalyzer test. The majority concluded Mr. Sheeks did not objectively manifest his confusion to the trooper.

In *Schoultz,* at 669, our Supreme Court had an opportunity to adopt the *Strand* objective manifestation of confusion test but did not expressly do so, although the court cited the *Strand* decision and noted the development of the *Strand* rule in the Court of Appeals. Subsequently in *State v. Staeheli,* 102 Wn.2d 305, 309, 685 P.2d 591 (1984), the court cited *Strand* for the rule "if the warnings confuse the

driver about his rights under the statute, he may claim that he had no reasonable opportunity to refuse." Again the court did not clarify whether objective manifestation of confusion was required to establish confusion.

Assuming *Strand* is the law in Washington on confusion as a defense to license revocation for refusal to take the Breathalyzer, *Strand* is distinguishable from the facts in this case because the officer in *Strand* would have no way of knowing of the defendant's confusion absent objective manifestation by the defendant of this confusion. In Mr. Sheeks' case, the same trooper who administered the sobriety test to Mr. Sheeks transported him to the station and gave the implied consent warnings. The trooper was aware of Mr. Sheeks' exposure to extreme cold, both as to length of exposure and his inadequate clothing. Mr. Sheeks' shivering and shaking would have been visible to the trooper. Also, Mr. Sheeks testified he kept telling the trooper how cold he was. Assuming further that *Strand* is applicable where cold, a physical cause, induces mental confusion as opposed to mere misunderstanding due to incomprehension of the warnings given, the record supports the trial court's finding that the trooper knew or should have known Russell Sheeks was confused at the time of the implied consent warning. Although there was no finding that the trooper denied Mr. Sheeks clarification, there is no evidence that further clarification was either offered or given by the trooper. Indeed, the trooper admitted no further clarification was given.

There was sufficient evidence to support a finding Mr. Sheeks was confused to the point he could not make a knowing and informed decision to refuse the Breathalyzer test. Here, we point to the record: Mr. Sheeks could not remember what he discussed with his attorney in the call from the station, did not recall being informed by the trooper that he would lose his right to drive if he refused the Breathalyzer, and reported he would not have refused the Breathalyzer had he been informed he would lose his license because in his line of work he has to have access to a

vehicle.[4] Mr. Sheeks went on to describe his state of mind at the station: he was shaking, having trouble breathing, just wanted to be warm, didn't feel well. (See footnote 2.) Whether or not Mr. Sheeks' testimony was credible was a question for the trial court and not a matter for retrial on appeal. The finding Mr. Sheeks was suffering from hypothermia rather than intoxication is supported by substantial evidence.

Finally, I disagree that this is an instance where the appellate court should examine the oral opinion of the trial court. The majority examines an additional reason given by the trial court for believing Mr. Sheeks was confused: that after talking to his attorney, Mr. Sheeks told the trooper he was refusing the test based on the advice of counsel, whereupon the trial court stated he knew counsel and found it hard to believe he would give such advice, therefore, it was further evidence of Mr. Sheeks' confusion. There is substantial evidence of Mr. Sheeks' confusion in the record, based upon his testimony and that of Judge Murphy. The appellate court therefore may not refer to the trial court's oral discussion or statements on the record because it is not needed to supplement the findings or clarify its decision. *Goodman v. Darden, Doman & Stafford Assocs.*, 100 Wn.2d 476, 481, 670 P.2d 648 (1983).

In summary, while I could have come to different conclusions had I been in the place of the trial judge, I was not there and neither was the majority. Following *State v. Black, supra,* our job as reviewing court is to determine only whether the evidence favorable to the prevailing party supports the challenged findings. Because it is my conclu-

---

[4]Russell Sheeks testified:

"Q. At any time did the Trooper tell you that you would lose your right to drive for one year if you did not take the breathalyzer test?

"A. No sir, he didn't.

"Q. If at any time the Trooper had told you this, would you have taken the breathalyzer test?

"A. I am sure I would have. In my line of business, I have to have access to an automobile. Uh, and a year, you know, that would put me out of business. I wouldn't be able to make a living."

sion that the trial court's findings of fact and conclusions of law meet the substantial evidence test, I would affirm the trial court's reinstatement of Mr. Sheeks' driving privileges.

Review denied by Supreme Court June 2, 1987.