[No. 31406-8-I. Division One. July 12, 1993.]

MARY E. MAIRS, *Respondent,* v. THE DEPARTMENT OF LICENSING, *Appellant.*

*Christine O. Gregoire, Attorney General,* and *Sara J. Mac-Duff, Assistant,* for appellant.

*Kenneth J. Evans* and *McIntosh, Lewis, Evans & Nielsen,* for respondent.

PER CURIAM. — The Department of Licensing of the State of Washington (Department) appeals the trial court order reversing its decision to revoke the driving privileges of Mary E. Mairs and reinstating her driver's license. Pursuant to RAP 18.12, the matter has been referred to a panel of this court for accelerated review on the merits. We affirm.

On the evening of September 30, 1990, Mairs was injured in a single-vehicle accident. Mairs was transported to a nearby hospital for treatment of her injuries. She was arrested at the

hospital by a trooper of the State Patrol for allegedly driving while under the influence of intoxicants. After advising Mairs of the implied consent warnings, State Trooper Ginnard asked Mairs to take a blood test; to which Mairs responded that she would give blood for medical purposes only.[1] The Department subsequently revoked Mairs' driver's license for refusing to submit to the blood test.

Mairs thereafter filed a petition in Skagit County Superior Court for de novo review pursuant to RCW 46.20.334. After a hearing on the petition, the Superior Court entered the following findings of fact:

1. The respondent issued an order of revocation revoking the petitioner's driver's license.

2. On September 30, 1990, Sgt. K. Ginnard of the Washington State Patrol arrested Mary E. Mairs in Skagit County, Washington.

3. At the time and place of the petitioner's arrest, Sgt. Ginnard had reasonable grounds to believe that the petitioner had been driving, or was in actual physical control of a motor vehicle, while under the influence of intoxicating liquor.

4. That during the time petitioner was in custody, Sgt. Ginnard advised petitioner of the rights under RCW 46.20.308 and the consequences of refusing to submit to a breath test.

5. Petitioner was treated for injuries at Cascade Valley Hospital. At the hospital, Sgt. Ginnard requested the petitioner to submit to a blood test. No BAC Verifier or Datamaster was present at Cascade Valley Hospital at the time of the request. Sgt. Ginnard had a portable breath testing device in his patrol vehicle at the time of the request and he indicated that the portable breath testing instrument was a breath testing device. He did not offer Mrs. Mairs a test with this instrument.

6. After having been informed of the implied consent rights and warning, petitioner indicated that she would give blood "for medical reasons only". She had already given a blood sample. The next day Sgt. Ginnard was aware of the blood sample because a representative of the hospital told him that the reading was a .41, to the best of his recollection.

7. Sgt. Ginnard attempted to clarify the implied consent rights to Mrs. Mairs by advising her that she would probably lose her license if she refused to take a blood test.

---

[1] At some point during Mairs' stay at the hospital, the hospital staff took a blood sample from Mairs.

Based on these findings, the court entered the following pertinent conclusions of law:[2]

 1. The court has jurisdiction over the parties and subject matter. Sgt. Ginnard testified that he had a breath testing instrument in his car, but did not offer a test from this instrument to Mrs. Mairs. RCW 46.20.308 does not define the term "breath testing instrument". Sgt. Ginnard was required to offer Mrs. Mairs a test from the breath testing instrument since one was present. Therefore, he incorrectly offered the petitioner a blood test.

 2. Sgt. Ginnard obtained the results of the blood test given by the hospital as a result of Mrs. Mairs' blood sample which was taken. Therefore, the state had access to the blood test results and Mrs. Mairs effectively complied with the statutory requirement to provide a sample.

 3. In addition, Sgt. Ginnard indicated that Mrs. Mairs' license would "probably" be suspended, which is in conflict with the implied consent warnings that her license "will" be revoked. This statement is confusing, given all the facts and circumstances of this case, and especially in light of Mrs. Mairs' comment that she would give blood for medical purposes only.

The court reversed the revocation of Mairs' driving privilege and ordered the Department to reinstate her driver's license. This appeal followed.

### DECISION

Initially, the Department assigns error to the following finding of fact entered by the trial court:

 7. Sgt. Ginnard attempted to clarify the implied consent rights to Mrs. Mairs by advising her that she would probably lose her license if she refused to take a blood test.

The Department contends that this formal finding is inconsistent with comments made by the trial court in its oral decision. Thus, the Department argues that it was error for the court to enter the written finding of fact. We disagree.

 The Department fails to cite any authority to support the claim. The law is well established that an appellate court need not decide a claim that is not supported by cita-

---

[2]Each quoted conclusion of law is a separate ground upon which the trial court reversed the administrative decision of the Department.

tion to authority. *Transamerica Ins. Group v. United Pac. Ins. Co.*, 92 Wn.2d 21, 29, 593 P.2d 156 (1979). In any event, the Department relies upon comments made by the court in its oral decision. Error cannot be predicated on the oral decision of the trial court. *Jones v. Nat'l Bank of Commerce*, 66 Wn.2d 341, 344, 402 P.2d 673 (1965); *Johnson v. Whitman*, 1 Wn. App. 540, 546, 463 P.2d 207 (1969) (oral decision of the trial court which is inconsistent with written findings and conclusions cannot be used to impeach them). In such cases, appellate review is limited solely to determining whether the trial court's findings of fact are supported by substantial evidence. *Jane Doe v. Boeing Co.*, 121 Wn.2d 8, 18, 846 P.2d 531 (1993). As stated in *Nordstrom Credit, Inc. v. Department of Rev.*, 120 Wn.2d 935, 939-40, 845 P.2d 1331 (1993):

> On appeal, the court reviews solely whether the trial court's findings of fact are supported by substantial evidence and, if so, whether the findings support the trial court's conclusions of law. *E.g., Willener v. Sweeting*, 107 Wn.2d 388, 393, 730 P.2d 45 (1986). The party challenging a finding of fact bears the burden of demonstrating the finding is not supported by substantial evidence. *Grein v. Cavano*, 61 Wn.2d 498, 507, 379 P.2d 209 (1963).

In this case, there was substantial evidence to support the trial court's finding of fact. Trooper Ginnard testified on cross examination that he told Mairs that she would probably lose her license if she refused to submit to the blood test. Trooper Ginnard testified that he read the implied consent warnings in the language of the statute on at least four occasions, but that Mairs expressed a lack of understanding of the warnings and that he then attempted to clarify the information by stating that her license would "probably" be suspended. Although the trooper later testified on redirect that he did not recall the exact words used to explain the specific implied consent warning to Mairs, "an appellate court will not substitute its judgment for that of the trial court even though it might have resolved the factual dispute differently." *Beeson v. ARCO*, 88 Wn.2d 499, 503, 563 P.2d 822 (1977). Since substantial evidence in the record supports

the challenged finding of fact, the only remaining question is whether the finding, in turn, supports the trial court's conclusion that the warning given by Trooper Ginnard was confusing and misstated the law. *See Department of Licensing v. Sheeks*, 47 Wn. App. 65, 68, 734 P.2d 24, *review denied*, 108 Wn.2d 1021 (1987).

■ ■ "If the information conveyed confuses the driver about his rights under the statute, the driver may claim that he had no reasonable opportunity to refuse." *Ghaffari v. Department of Licensing*, 62 Wn. App. 870, 877, 816 P.2d 66 (1991), *review denied*, 118 Wn.2d 1019 (1992); *Keefe v. Department of Licensing*, 46 Wn. App. 627, 632, 731 P.2d 1161 ("The underlying purpose of the implied consent statute is to provide the driver the opportunity to make an intelligent decision as to whether to exercise the statutory right of refusal."), *review denied*, 108 Wn.2d 1018 (1987).

The warning in this case was inaccurate because it implied that Mairs might not have her license revoked even though she refused to submit to a blood test. *See Cooper v. Department of Licensing*, 61 Wn. App. 525, 527, 810 P.2d 1385 (1991) ("In Washington, if a driver refuses to take a breath test after proper warning, it is an absolute certainty that he will lose his license for a minimum of 1 year. RCW 46.20.311(2)(d)."); *Burnett v. Department of Licensing*, 66 Wn. App. 253, 259, 832 P.2d 1321 (1992) (the warnings of the implied consent law "clearly imply that upon refusal to take a breath test, the driver will be left without any driver's license for some period of time"). In addition, the advice was prejudicial because it encouraged Mairs not to take the blood test. *See Cooper v. Department of Licensing*, 61 Wn. App. at 528.

The key facts in this case are similar to the facts in *Cooper*. In *Cooper*, a driver arrested for DWI was advised by the arresting officer that if he refused to take a breath test, his driver's license would be revoked "probably for at least a year". *Cooper v. Department of Licensing*, 61 Wn. App. at 528. The driver appealed the subsequent revocation of his driver's license. On appeal, the court held that the inaccurate warning prevented

the allegedly intoxicated driver from making a knowing and intelligent decision regarding whether to take the breath alcohol test and reversed the decision of the Department of Licensing revoking his driver's license. *Cooper v. Department of Licensing*, 61 Wn. App. at 528-29. Similarly, the trial court here properly concluded that the advice given by Trooper Ginnard was confusing. Accordingly, Mairs did not make a knowing and intelligent decision on whether to take or refuse a test of the alcohol content of her blood.[3] *See Cooper v. Department of Licensing, supra; Welch v. Department of Motor Vehicles*, 13 Wn. App. 591, 592, 536 P.2d 172 (1975) ("the opportunity to exercise intelligent judgment requires that the operator be advised of the mandatory effect of a refusal to be tested").

The Department contends that the trial court also erred in concluding that Trooper Ginnard improperly inquired regarding whether Mairs would submit to a test of the alcohol content of her blood. The court ruled that the trooper failed to comply with the statutory requirements of RCW 46.20.308. Pursuant to the statute, a person arrested for DWI cannot be asked to take a blood test for blood alcohol content unless "[t]he person is incapable due to physical injury, physical incapacity, or other physical limitation, of providing a breath sample; or (b) as a result of a traffic accident the person is being treated for a medical condition in a hospital, clinic, doctor's office, or other similar facility in which a breath testing instrument is not present . . .." RCW 46.20.308(2)(a).

> Although the statute allows an arresting officer to request both breath and blood tests, it does not leave the choice between the two to the arresting officer's discretion. Instead, it states specific conditions which must be met before a blood test may be administered in lieu of a less intrusive breath test.

*O'Neill v. Department of Licensing*, 62 Wn. App. 112, 120, 813 P.2d 166 (1991); *Shelden v. Department of Licensing*, 68 Wn. App. 681, 686-87, 845 P.2d 341 (1993). The State bears the

---

[3] Although this reason alone is sufficient to uphold the decision of the trial court, we shall address the remaining issues because they involve matters of broad public interest.

initial burden of proving that a breath testing instrument was not present at the hospital where Mairs was treated. *See O'Neill,* at 121; *Shelden,* at 686.

In this case, it is undisputed that no breath testing instrument was present inside the hospital where Mairs was treated for her injuries. Since a portable breath testing device was present in Trooper Ginnard's patrol car, the trial court concluded that Trooper Ginnard had improperly asked Mairs to take a blood test.

The resolution of this issue turns on the definition of breath testing instrument. The term "breath testing instrument" is not defined in RCW 46.20.308. The provisions of RCW 46.20.308 cannot, however, be read in isolation and must instead be harmonized with other relevant statutory provisions in order to advance the overall goals of the Legislature in enacting the implied consent law. To that end, RCW 46.61.506(3) states:

> Analysis of the person's blood or breath to be considered valid under the provisions of this section or RCW 46.61.502 or 46.61.504 shall have been performed according to methods approved by the state toxicologist and by an individual possessing a valid permit issued by the state toxicologist for this purpose. The state toxicologist is directed to approve satisfactory techniques or methods . . ..

The statute clearly requires that the methods for testing a person's blood or breath must be approved by the state toxicologist. As stated by the Court of Appeals,

> To be valid an analysis of breath . . . 'shall have been performed according to methods approved by the state toxicologist'. RCW 46.61.506(3)." *State v. Ford,* 110 Wn.2d 827, 829, 755 P.2d 806 (1988). Among the regulations adopted by the State Toxicologist is WAC 448-12-015. Thus, by statute, a Breathalyzer test is *valid* only if the machine is maintained in accordance with this regulation. In *State v. Ryan,* 43 Wn. App. 488, 717 P.2d 1390 (1986), the court observed that, in order for the [*State v.*] *Baker* [56 Wn.2d 846, 355 P.2d 806 (1960)] requirement to be satisfied, "a maintenance operator must follow the directives of WAC 448-12-015". *Ryan,* at 490 (citing [*State v.*] *Peterson* [100 Wn.2d 788, 674 P.2d 1251 (1984)]). Compliance with WAC 448-12-015 is the exclusive method of establishing admissibility of Breathalyzer results.

(Footnote omitted.) *State v. Watson*, 51 Wn. App. 947, 950, 756 P.2d 177 (1988); *State v. Peterson*, 100 Wn.2d 788, 789, 674 P.2d 1251 (1984) ("As part of the foundation requirement for the admission of Breathalyzer test results, the State must introduce prima facie evidence to show that the machine was properly checked and in proper working order at the time of conducting the test").

The Department relies on WAC 448-13-020, which provides in relevant part:

> Pursuant to RCW 46.61.506, the BAC Verifier DataMaster is the only infrared breath test instrument approved by the state toxicologist as a device for the measurement of alcohol in a person's breath.

Unfortunately for the Department, the regulation was not in effect at the time of Mairs' arrest for DWI. We must look instead to the former regulations governing the administration of Breathalyzer tests, WAC 448-12.

Nothing in the record before this court establishes that the portable breath test device in Trooper Ginnard's patrol car was maintained in accordance with those regulations. The evidence is to the contrary. Former WAC 448-12-015 expressly requires a maintenance operator to check and calibrate a Breathalyzer machine at least once every 3 months. The maintenance operator must provide the custodian of the Breathalyzer with a certificate that the calibration of the machine was performed in accordance with the methods and rules of the state toxicologist and must indicate whether the machine was in proper working order when checked. Former WAC 448-12-016. Trooper Ginnard testified that the portable breath testing device in his patrol car was not certified. For all intents and purposes, no approved machine was therefore present at the hospital to measure Mairs' level of intoxication. Accordingly, the trial court erred in concluding that a suitable breath testing instrument was available at the hospital when Mairs was asked to take the blood test.

The Department next contends that the Superior Court erred in concluding that Mairs had effectively complied with

the statutory requirement of the implied consent law. The court concluded that Mairs did not "refuse" to take the blood test within the meaning of RCW 46.20.308 because Trooper Ginnard received information regarding Mairs' level of intoxication from a separate blood test administered at the hospital. The conclusion reached by the trial court is, however, erroneous.

It is the refusal to take the blood alcohol test offered by the arresting officer which triggers the revocation of the person's driver's license. RCW 46.20.308(6). A driver arrested for DWI does not get a second chance. As explained in *Currier v. Department of Motor Vehicles*, 20 Wn. App. 16, 18-19, 578 P.2d 1325 (1978),

> Currier next contends that even though he initially refused the test, his change of mind and later request to take the test nullified his initial refusal. We find nothing in the statute that would require the sheriff to administer the test once there has been a refusal. To the contrary under the statute, even if the sheriff had allowed Currier to take the test, it would not have changed the effect of the initial refusal. The sworn statement of an arresting officer that a properly informed accused refused the test mandates the suspension of his driver's license. RCW 46.20.308(3). *Skinner v. Sillas*, 58 Cal. App. 3d 591, 130 Cal. Rptr. 91 (1976).

To hold otherwise would lead to untenable results.

Mairs points out that one of the main objectives of the implied consent law is to ensure that the State is provided reliable information of intoxication or nonintoxication. Mairs argues that, since Trooper Ginnard eventually received information regarding her level of intoxication, the purpose of the statute has been fulfilled. However, the court in *Nowell v. Department of Motor Vehicles*, 83 Wn.2d 121, 124, 516 P.2d 205 (1973) identified three important objectives of the implied consent law:

> (1) to discourage individuals from driving an automobile while under the influence of intoxicants, (2) to remove the driving privileges from those individuals disposed to driving while inebriated, and (3) to provide an efficient means of gathering reliable evidence of intoxication or nonintoxication.

The first two objectives are clearly not served if the results of the substitute test cannot later be used against a suspected intoxicated driver in criminal and civil proceedings. "Before blood alcohol test results can be admitted into evidence, the State must present prima facie proof that the test chemicals and the blood sample are free from any adulteration which could conceivably introduce error to the test results." *State v. Clark*, 62 Wn. App. 263, 270, 814 P.2d 222 (1991).

The regulations promulgated by the state toxicologist for analyzing blood do not specify the approved testing methods, "but rather, outlines the *criteria* any approved method must meet." *State v. Clark*, *supra* at 268. "The regulations approve the tests only if they meet strict standards for precision, accuracy, and specificity." *State v. Schulze*, 116 Wn.2d 154, 167, 804 P.2d 566 (1991). These uniform procedures help to ensure that the test results will be accurate and reliable.

In this case, Mairs expressly refused to take the blood test requested by Trooper Ginnard. There is nothing in the record here to indicate that the test conducted by the hospital was performed in accordance with the procedures set forth in the regulations governing blood tests. The trial court thus erred in concluding that Mairs had effectively complied with the requirements of RCW 46.20.308.

In summary, the trial court properly concluded that the advice given by Trooper Ginnard was confusing and misleading. Although the court erred in concluding that a breath test instrument was present at the hospital and that Mairs had "effectively" complied with the implied consent statute, we reluctantly (given the extent of Mairs' impairment (.41)) agree with Mairs that the decision of the trial court should nonetheless be affirmed. *See Tropiano v. Tacoma*, 105 Wn.2d 873, 876-77, 718 P.2d 801 (1986) (a judgment will be affirmed on any theory raised at trial and considered by the trial court).

Affirmed.