IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| In re Parental Rights to | ) | No. 35132-7-III |
| | ) | |
| | ) | |
| | ) | UNPUBLISHED OPINION |
| D.J.J.† | ) | |
| | ) | |
| | ) | |

LAWRENCE-BERREY, A.C.J. — Mr. V. appeals the trial court's order terminating

his parental rights to his son, D.J.J. Mr. V. argues the termination order must be reversed

because (1) the Department of Social and Health Services (DSHS) failed to offer

parenting education services to him, (2) the record does not support the trial court's

findings on the incarceration factors, and (3) termination of the parent-child relationship

is not in the best interest of D.J.J. We disagree and affirm.

---

† To protect the privacy interests of D.J.J., a minor, we use his and his parents'
initials throughout this opinion. General Order of Division Three, *In Re the Use of
Initials or Pseudonyms for Child Victims or Child Witnesses* (Wash. Ct. App. June 18,
2012).

## FACTS

*Background facts*

D.J.J. was born December 11, 2013, to Ms. J. and Mr. V. After his birth, D.J.J. lived with his mother, and Mr. V. saw him on weekends.

In July 2014, the Yakima County Superior Court entered a temporary parenting plan order in D.J.J.'s paternity case. The order authorized Mr. V. to have supervised visits with D.J.J., but first required Mr. V. to provide a clean hair follicle test, undergo a drug and alcohol evaluation and follow all recommendations, and participate in a domestic violence evaluation and follow all recommendations. A separate order in the paternity case restrained Mr. V. from coming within 500 feet of D.J.J. The restraining order was reviewable once Mr. V. progressed with the treatment plan set forth in the temporary parenting plan. Sometime in August 2014, Mr. V. went to California with Ms. J. and D.J.J., in disregard of the no-contact order.

Molly Fields, a DSHS social worker, received information that Ms. J. took D.J.J. somewhere and used marijuana, cocaine, and methamphetamine with Mr. V. Ms. Fields investigated, but was unable to locate anyone. Mr. V. later testified that despite the no-contact order, he and Ms. J. took the baby to California.

2

Ms. Fields had grave concerns about the baby's welfare. On August 6, 2014, she filed a dependency petition. DSHS could not locate Mr. V. and notify him of the shelter care hearing. Ms. Fields soon after transferred the case to DSHS social worker Leticia Saenz.

Mr. V. contacted Ms. Saenz to arrange visitation, which occurred in August and September 2014. At this point, Ms. Saenz discovered a no-contact order prevented these visits, and they abruptly stopped.

On October 29, 2014, Mr. V. agreed to an order of dependency. The court entered a dispositional order the same day. The dispositional order required Mr. V. to participate in a substance abuse evaluation and follow recommended treatment, to obtain a domestic violence evaluation and follow recommended treatment, and to obtain a mental health assessment and follow recommended treatment. One year later, in November 2015, the trial court ordered Mr. V. to participate in parenting education.

On January 28, 2015, Mr. V. sought permission from the dependency court to resume visitations with D.J.J. The dependency court granted Mr. V.'s request and ordered supervised visits. Supervised visits took place in February and March 2015, and D.J.J. and Mr. V. interacted favorably together. Mr. V. abruptly stopped attending visits in March 2015. Mr. V. did not give any reason for failing to attend. At the termination

3

trial, Mr. V. testified that he might have stopped visiting D.J.J. because of a no-contact order. But it was not until September 8, 2015, when his contact with D.J.J. was prohibited. The September order prohibited Mr. V. from having contact with D.J.J. for two years. Mr. V. never attempted to modify the September 2015 order.

*Mr. V.'s history of substance abuse and noncompliance with treatment*

Mr. V. has a history of marijuana and methamphetamine use. In 2013, he participated in outpatient treatment at Merit Resources, as a probation requirement from a previous criminal conviction. He did not successfully complete that treatment. As described above, in 2014, he was ordered to undergo a substance abuse evaluation and to follow all treatment recommendations. In conjunction with this requirement, Ms. Saenz referred him for four urinalysis (UA) tests, but he provided only one. When Ms. Saenz first asked Mr. V. to provide a UA sample, he initially refused to do so because he was using drugs.

Starting in the fall of 2014 and continuing into early 2015, Mr. V. again participated in outpatient treatment at Merit Resources, three times per week. He successfully completed treatment and the program transitioned him to once per week treatment. Shortly after, he failed a UA and his substance abuse counsellor referred him to inpatient treatment.

4

The James Oldham Treatment Center provided inpatient treatment for Mr. V. Three-fourths through the program, Mr. V. obtained permission to leave the facility so he could attend court. Mr. V. went to court, but he did not return immediately to the treatment center in accordance with his leave agreement. Instead, he went to DSHS where he had contact with Ms. Saenz and Ms. J. He also went to see his family. The treatment center terminated his treatment because Mr. V. violated the leave agreement.

Mr. V. did not engage in any treatment since being terminated from the James Oldham Treatment Center. He told Ms. Saenz he would seek a new substance abuse evaluation in Seattle, but he never told her the name of the place he planned to attend.

The trial court found that Mr. V. had a significant and unresolved substance abuse problem, frequently minimized his drug use, and refused to acknowledge it. The trial court found Mr. V.'s testimony vague and evasive concerning subjects detrimental to him. Mr. V. did acknowledge that his drug use caused problems with the police and sometimes drove his violent behavior. Nonetheless, Mr. V. believed he did not need substance abuse treatment.

*Mr. V.'s history of domestic violence and noncompliance with treatment*

The court found Mr. V. had a "significant and unresolved domestic violence problem." Clerk's Papers (CP) at 176. Reynaldo Chavez worked at Northwest

Behavioral Modification Clinic and completed two domestic violence evaluations of Mr. V. The first evaluation was in 2012 for a criminal offense. The second evaluation was in November 2014 in conjunction with the dependency proceeding.

In November 2014, Mr. Chavez recommended that Mr. V. complete an 18-month treatment program, well above the 12-month standard. Mr. Chavez explained that his recommendation was because Mr. V. had an "extensive history of violent offenses." Report of Proceedings (RP) at 127. Mr. V. participated for only six weeks before he stopped attending. Mr. Chavez explained that clients actively using marijuana and methamphetamine could not engage in treatment or utilize the tools the program teaches.

*August 2015 incident*

In August 2015, while Ms. J. still had placement of D.J.J., Ms. Saenz went to Ms. J.'s home to give Ms. J. a ride so that Ms. J. and D.J.J. could run errands. Ms. Saenz went inside the home and noticed its condition. She also noticed that Ms. J., when leaving the house, was unable to lock the door from the outside. The three returned from errands a few hours later. Ms. Saenz stayed in the car while Ms. J. went to the front door. The front door was locked, and Ms. J. could not get in. Ms. J. saw Mr. V. in the home and started yelling. Ms. Saenz saw Mr. V. leave the home to run away. She called police.

6

The inside of the house had been torn apart. Papers and furniture were strewn everywhere, and a large number of electronic items were gathered by the door. In addition, there was a large knife in D.J.J.'s bedroom, which had not been there earlier.

Because of the incidents, Ms. Saenz took Ms. J. to a safe house for domestic violence incidents. Ms. J. obtained a protection order for herself and for D.J.J.

Soon after, D.J.J. was placed with his maternal grandmother, Maria Reyes.

*Mr. V.'s incarceration, Child Protective Services, and criminal history*

In January 2016, Mr. V. was arrested for felony violation of a no-contact order for having contact with Ms. J. Mr. V. was booked into the Yakima County jail where he awaited trial. Ms. Saenz asked whether services were available to Mr. V. while in jail. She learned that the only available service was a substance abuse evaluation. Ms. Saenz did not make a referral for a substance abuse evaluation because it was her understanding that Mr. V. already had an evaluation and only needed treatment.

Mr. V. subsequently was convicted of felony violation of a no-contact order and transferred to the Washington State Penitentiary. Ms. Saenz asked classification counselor Tonya Gould whether parenting and domestic violence treatment services were available to Mr. V. at the penitentiary. Ms. Gould said that they were not. Ms. Saenz also asked Ms. Gould if substance abuse treatment was available. Ms. Gould said that such

7

treatment was available, but was very limited, and was generally provided only to prisoners serving special sentences that required drug treatment as a condition of their sentences. Because Mr. V.'s sentence did not require substance abuse treatment, Ms. Gould did not believe that Mr. V. would be able to receive such treatment while incarcerated.

Mr. V. has seven convictions for drug, theft, firearm, and domestic violence offenses. In 2014, he acknowledged to Ms. Saenz that a warrant had been issued for his arrest. During the dependency proceeding, he was incarcerated for 29 days for violating a no-contact order with a woman other than Ms. J. and was also incarcerated for felony violation of a no-contact order, beginning in January 2016.

*Parenting education*

DSHS did not offer Mr. V. parenting education between November 2015, when the court ordered them, and his incarceration in January 2016. Ms. Saenz testified she was waiting for Mr. V. to engage in substance abuse treatment before referring him for parenting education, so that parenting education would not be futile. She was concerned he would not benefit from the service while he was using drugs. Mr. V. thought parenting education services could benefit him, but also did not think they were necessary.

8

*Termination trial*

The termination trial occurred in late January 2017. The trial court heard testimony from social workers, several providers, Mr. V., and Ms. Reyes. The guardian ad litem recommended terminating Mr. V.'s parental rights. After hearing the evidence and closing arguments, the trial court ruled in favor of DSHS. Later, the trial court entered comprehensive findings of fact and conclusions of law. Mr. V. timely appealed.

## ANALYSIS

### A.    STANDARD OF REVIEW

This court must affirm findings of fact under RCW 13.34.180(1) if substantial evidence from which a rational trier of fact could find the necessary facts by clear, cogent, and convincing evidence supports the findings. *In re Dependency of K.S.C.*, 137 Wn.2d 918, 925, 976 P.2d 113 (1999). Evidence is substantial if it is sufficient to persuade a fair-minded person of the truth of the matter asserted. *In re Welfare of S.J.*, 162 Wn. App. 873, 881, 256 P.3d 470 (2011). Clear, cogent, and convincing evidence exists when the ultimate fact at issue is "highly probable." *K.S.C.*, 137 Wn.2d at 925. Unchallenged findings are verities on appeal. *In re Interest of Mahaney*, 146 Wn.2d 878, 895, 51 P.3d 776 (2002).

Because the trial court hears the testimony and observes the witnesses, it is entitled to deference concerning credibility of witnesses or weight of the evidence. *In re Welfare of L.N.B.-L.*, 157 Wn. App. 215, 243, 237 P.3d 944 (2010). If a trial court has resolved conflicting evidence, this court will not substitute its judgment for that of the trial court, even if this court would have resolved a factual dispute differently. *Mairs v. Dep't of Licensing*, 70 Wn. App. 541, 545, 854 P.2d 665 (1993). The party claiming error has the burden of showing that a finding of fact is not supported by substantial evidence. *Fisher Properties, Inc. v. Arden-Mayfair, Inc.*, 115 Wn.2d 364, 369, 798 P.2d 799 (1990).

B.     GENERAL PROOF REQUIREMENTS FOR TERMINATION PROCEEDINGS

Parents have a fundamental liberty interest in the care, custody, and companionship of their children. *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982). Therefore, the State may interfere with parents' rights "'only for the most powerful [of] reasons.'" *S.J.*, 162 Wn. App. at 880 (alteration in original) (internal quotation marks omitted) (quoting *In re Welfare of A.J.R.*, 78 Wn. App. 222, 229, 896 P.2d 1298 (1995)). When the parental actions may cause harm or a risk of harm to the child, the State has a right and responsibility to protect the child. *In re Custody of Smith*, 137 Wn.2d 1, 18, 969 P.2d 21 (1998), *aff'd on other grounds sub nom.*, *Troxel v. Granville*, 530 U.S. 57, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000). Therefore,

"reunification must be balanced against the child's right to basic nurture, physical and mental health, and safety; ultimately, the child's rights and safety should prevail." *In re Welfare of A.G.*, 155 Wn. App. 578, 589, 229 P.3d 935 (2010), *review granted and reversed on other grounds following remand*, 160 Wn. App. 841, 248 P.3d 611 (2011).

Washington courts use a two-step process to determine whether to terminate parental rights. RCW 13.34.180(1); *In re Welfare of A.B.*, 168 Wn.2d 908, 911, 232 P.3d 1104 (2010). The first step focuses on the adequacy of the parents and requires the State to prove the six statutory elements of RCW 13.34.180(1) by clear, cogent, and convincing evidence. RCW 13.34.190(1)(a)(i); *A.B.*, 168 Wn.2d at 911. The six statutory elements required by the first step are:

> (a) That the child has been found to be a dependent child;
> (b) That the court has entered a dispositional order pursuant to RCW 13.34.130;
> (c) That the child has been removed or will, at the time of the hearing, have been removed from the custody of the parent for a period of at least six months pursuant to a finding of dependency;
> (d) That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the reasonable future have been expressly and understandably offered or provided;
> (e) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future. A parent's failure to substantially improve parental deficiencies within twelve months following entry of the dispositional order shall give rise to a rebuttable

11

presumption that there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future. . . .

. . . .

(f) That continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home. If the parent is incarcerated, the court shall consider whether a parent maintains a meaningful role in his or her child's life based on factors identified in RCW 13.34.145(5)(b); whether the department or supervising agency made reasonable efforts as defined in this chapter; and whether particular barriers existed as described in RCW 13.34.145(5)(b) including, but not limited to, delays or barriers experienced in keeping the agency apprised of his or her location and in accessing visitation or other meaningful contact with the child.

RCW 13.34.180(1). The second step asks whether termination is in the best interests of

the child. RCW 13.34.190(1)(b); *A.B.*, 168 Wn.2d at 925.

C.    PARENTING EDUCATION SERVICES

Mr. V. asserts that not all ordered services were offered. Specifically, he asserts

that DSHS's failure to offer parenting services, either before or during his incarceration,

requires this court to reverse the termination order. We disagree.

The dependency court first ordered parenting education in November 2015. Mr.

V.'s incarceration began in January 2016. Mr. V. claims that he was clean and sober

during these two months and that he could have benefitted from parenting education

services. Mr. V.'s claim that he was clean and sober during this time has no support in

12

the record. Several unchallenged findings note that Mr. V. had a significant and unresolved substance abuse problem and had failed inpatient and outpatient treatment.

Alternatively, Mr. V. claims that DSHS had a legal obligation to provide parenting education services while he was incarcerated, even if the services were unavailable. We disagree.

A parent's unwillingness or inability to avail himself of remedial services within a reasonable period is highly relevant to a court's determination of whether the elements of RCW 13.34.180 are established. *In re Dependency of C.T.*, 59 Wn. App. 490, 499, 798 P.2d 1170 (1990). Here, Mr. V. was unable to avail himself of parenting education because he was incarcerated for a lengthy period.

Mr. V. would have a court delay termination of his parental rights until he was out of prison and no longer using illegal drugs. But the law does not require a child to wait indefinitely while a parent continues to engage in criminal and self-destructive behavior. More than two years passed between when this dependency commenced and the termination trial. After more than two years, Mr. V. was no closer to remedying his parental deficiencies.

D.   INCARCERATION FACTORS

Mr. V. next argues the trial court did not properly consider incarcerated parent factors set forth in RCW 13.34.145 (b)(i), (ii), (iii), and (vi).  We disagree.

RCW 13.34.180(1)(f) requires a court to consider whether continuation of the parent-child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home.  If a parent is incarcerated at the time of trial, that subsection also requires the trial court to consider whether the incarcerated parent maintains a meaningful role in his child's life based on factors listed in RCW 13.34.145(5)(b).  *In re Parental Rights to K.J.B.,* 187 Wn.2d 592, 606, 387 P.3d 1072 (2017).  Those factors are:

> (i)  The parent's expressions or acts of manifesting concern for the child, such as letters, telephone calls, visits, and other forms of communication with the child;
> (ii)  The parent's efforts to communicate and work with the department or supervising agency or other individuals for the purpose of complying with the service plan and repairing, maintaining, or building the parent-child relationship;
> (iii)  A positive response by the parent to the reasonable efforts of the department or the supervising agency;
> (iv)  Information provided by individuals or agencies in a reasonable position to assist the court in making this assessment, including but not limited to the parent's attorney, correctional and mental health personnel, or other individuals providing services to the parent;
> (v)  Limitations in the parent's access to family support programs, therapeutic services, and visiting opportunities, restrictions to telephone and mail services, inability to participate in foster care planning meetings, and

difficulty accessing lawyers and participating meaningfully in court proceedings; and

(vi) Whether the continued involvement of the parent in the child's life is in the child's best interest.

RCW 13.34.145(5)(b).

Here, the trial court considered all of the factors and entered findings pertinent to each of them.

Mr. V. argues there was a no-contact order that prohibited him from interacting with D.J.J. and that he did everything within his power to show his love for D.J.J. He argues, "[I] expressed [my] devotion to [my] son by maintaining good behavior, working, and obtaining [my] [general education certificate] in prison, and by signing up for all possible services offered by the penitentiary, including substance abuse treatment." Br. of Appellant at 17. But, even if true, none of these efforts bear on the challenged factors.

Here, Mr. V. stopped visiting D.J.J. in March 2015, several months before the September 2015 no-contact order. That order was entered as a result of Mr. V. breaking into the home where D.J.J. and Ms. J. lived, ransacking it for electronic equipment, and placing a large knife on D.J.J.'s bed.

After March 2015, Mr. V. neither had nor sought a role in D.J.J.'s life. Although the September 2015 no-contact order prohibited Mr. V. from contacting D.J.J., he could have sought DSHS's assistance in amending the no-contact order so to have telephonic or

15

written contact with his son. He had successfully asked DSHS to assist him in a similar manner before.

Ms. Saenz testified that D.J.J. never asked for his father, D.J.J. had not seen his father in over a year, his father was a stranger to D.J.J., and a continued parent-child relationship would diminish D.J.J.'s prospects for a stable home. D.J.J. had been in a stable home for over 18 months, and Ms. Saenz thought that removal would devastate him. The guardian ad litem similarly testified.

We conclude the trial court properly considered the incarcerated parent factors.

E.    THE CHILD'S BEST INTEREST

Mr. V. challenges the trial court's finding that termination is in D.J.J.'s best interest. He argues that DSHS did not prove termination was in his child's best interest because some evidence in the record shows that he and D.J.J. had positive visits.

Mr. V. notes that he had positive supervised visits with D.J.J. in February and March 2015. He offers no other argument and does not explain why this court should substitute its judgment for that of the trial court. The trial court heard testimony from Ms. Saenz, Dolores Cantu, and the guardian ad litem that Mr. V. and D.J.J. were not bonded, D.J.J. had been in a stable home for over 18 months, and removal from that home would devastate him.

No. 35132-7-III
*In re Parental Rights to D.J.J.*

We conclude that substantial evidence supports the trial court's finding that termination of Mr. V.'s parental rights was in D.J.J.'s best interest.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Lawrence-Berrey, A.C.J.

WE CONCUR:

Korsmo, J.

Pennell, J.

17