[No. 15974-1-II.    Division Two.    April 29, 1994.]

THE DEPARTMENT OF LICENSING, *Respondent*, v. RALPH W. LAX, *Appellant*.

8

*D. Geral Barnhart* of *Clallam-Jefferson Public Defender,* for appellant.

*Christine O. Gregoire, Attorney General,* and *John S. Barnes, Assistant,* for respondent.

ALEXANDER, J. — Ralph W. Lax appeals an order of the Jefferson County Superior Court affirming the Department of Licensing's (Department) decision to revoke his motor vehicle driver's license. Lax contends that the trial court erred in concluding that he refused to submit to a blood test. We reverse.

The pertinent facts of this case are undisputed.[1] In the early morning hours of January 1, 1991, Ralph W. Lax was arrested by Washington State Patrol Trooper Kenneth J. Przygocki for the offense of driving while under the influence of intoxicating liquor. Prior to Lax's arrest, Przygocki had been dispatched to a reported accident on Highway 101 in Jefferson County. When Przygocki arrived at the scene, he discovered Lax lying in the northbound lane of traffic. Further up the road, Lax's car, which had a flat tire, was partially blocking a lane of traffic. Trooper Przygocki noticed "a very strong odor of alcohol" emanating from Lax's breath, so he administered a field sobriety test. Przygocki concluded that Lax failed the test.

Przygocki then placed Lax in his patrol car and proceeded to the Jefferson County corrections facility. En route, Lax began to complain that he was having chest pains, so Przygocki took him to the Jefferson General Hospital. At the hospital, Lax was taken to the emergency room, where hospital personnel attached monitoring equipment to his chest and also administered an EKG test. After receiving permission from the attending hospital personnel, Przygocki read Lax his implied consent warnings in accordance with RCW 46.20.308(2)[2] and asked him if he would submit to a blood test. Lax "refused to allow the blood sample to be drawn at that time".[3]

---

[1]Neither Lax nor the Department assigned error to any of the trial court's findings of fact. Therefore, they are verities on appeal. *Metropolitan Park Dist. v. Griffith*, 106 Wn.2d 425, 433, 723 P.2d 1093 (1986).

[2]RCW 46.20.308(2) provides in part: "The officer shall inform the person of his or her right to refuse the breath or blood test, and of his or her right to have additional tests administered by any qualified person of his or her choosing as provided in RCW 46.61.506. The officer shall warn the driver that (a) his or her privilege to drive will be revoked or denied if he or she refuses to submit to the test, and (b) that his or her refusal to take the test may be used in a criminal trial."

[3]Although Lax referred in his brief and at oral argument to his "perceived refusal", Lax did not assign error to the trial court's finding of fact that Lax initially refused to provide a blood sample. We will, therefore, accept as a verity that Lax refused to submit to a blood test when Trooper Przygocki initially asked him to do so.

Przygocki remained at the hospital in order to determine if Lax would be released. Subsequently, a nurse approached Lax and asked to draw blood from him. Lax refused. Shortly after Lax told the nurse that he would not give her a blood sample, Lax "asked the [t]rooper if he still wanted a blood sample". The trooper responded that because Lax had refused his initial request, he was making no further request. Lax then "volunteered to give blood and a sample was drawn by hospital personnel approximately 12 minutes after the initial refusal". The blood sample was placed in a "sample vial" supplied by the hospital to store and preserve blood samples for subsequent blood alcohol testing. The hospital provided the vial with Lax's blood to Przygocki for evidentiary purposes, and it was used in evidence by the State at Lax's trial in Jefferson County District Court on the charge of driving while under the influence of intoxicating liquor.[4]

Przygocki completed and signed a report in which he indicated Lax had refused to submit to a blood test. The report was sent to the Department of Licensing. Upon receipt of the report, the Department revoked Lax's driver's license pursuant to RCW 46.20.308(6).[5] Lax sought a trial de novo in Jefferson County Superior Court pursuant to RCW 46.20.308(8) and RCW 46.20.334.[6] Following trial, the Superior Court sustained the Department's decision to revoke Lax's driving privilege.

---

[4]Przygocki claimed that, as a police officer, he was obligated to take the blood sample offered to him as evidence.

[5]RCW 46.20.308(6) provides in part:

"(6) The department of licensing, upon the receipt of a sworn report of the law enforcement officer . . . that the person had refused to submit to the test or tests upon the request of the law enforcement officer after being informed that refusal would result in the revocation of the person's privilege to drive, shall revoke the person's license . . .".

[6]Although it is not reflected in the record, we assume that the Department held a hearing pursuant to RCW 46.20.308(7) and that the revocation of Lax's license was sustained at that hearing. It is only after such a hearing that the Department's order can be reviewed in superior court. RCW 46.20.308(8).

## I

In support of his argument that his license should not be revoked, Lax contends that although he initially refused to provide a blood sample to Trooper Przygocki, he subsequently agreed to provide a sample and did so.[7] His actions, he argues, should not, as a matter of law, be deemed a refusal.

RCW 46.20.308(5) provides:

> If, following his or her arrest and receipt of warnings under subsection (2) of this section, *the person arrested refuses upon the request of a law enforcement officer to submit to a test or tests of his or her breath or blood, no test shall be given* except as authorized under subsection (3) or (4) of this section.

(Italics ours.)

In *Currier v. Department of Motor Vehicles*, 20 Wn. App. 16, 578 P.2d 1325 (1978), Division One of this court was presented with the issue we face. There, the person arrested for driving while under the influence of intoxicating alcohol, Currier, refused to take a breath test at the Island County Jail after the arresting officer offered him the opportunity to take it. At some later point, following the arresting officer's departure from the jail, Currier apparently changed his mind and requested an opportunity to take a breath test. A deputy sheriff refused his request, telling Currier that "the test had to be administered in the presence of the arresting trooper who had departed 10 to 15 minutes earlier". *Currier*, 20 Wn. App. at 18. Currier appealed the subsequent revocation of his license, contending that "his change of mind and later request to take the test nullified his initial refusal". *Currier*, 20 Wn. App. at 18.

Division One held that "nothing in the statute [RCW 46.20.308] . . . require[s] the sheriff to administer the test once there has been a refusal". *Currier*, at 18. Significantly,

---

[7]Although the trial court did not make a factual finding that Lax ever told Przygocki that he wanted to submit to a blood test, the trial court did find that Lax "volunteered to give blood" 12 minutes after his initial refusal, that a sample was drawn, and that the sample was provided to Przygocki. The only reasonable inference from these facts is that when Lax volunteered to give blood, he manifested both his submission to a blood test and his determination to provide that blood sample to the police.

the court held that under the statute even if the sheriff had allowed Currier to take the test, it would not have changed the effect of the initial refusal. *Currier*, 20 Wn. App. at 18-19. Finally, the court noted that the suspect "could not avoid the mandatory license suspension by later rescinding his initial refusal". *Currier*, 20 Wn. App. at 19.

Division One recently reaffirmed the position it took in *Currier* in *Mairs v. Department of Licensing*, 70 Wn. App. 541, 854 P.2d 665 (1993). *See also Wolf v. Department of Motor Vehicles*, 27 Wn. App. 214, 219, 616 P.2d 688 (1980) (reaffirming holding of *Currier*). The court noted in *Mairs* that "[i]t is the refusal to take the blood alcohol test offered by the arresting officer which triggers the revocation of the person's driver's license". 70 Wn. App. at 550. The court opined that "[a] driver arrested for DWI does not get a second chance". 70 Wn. App. at 550. In *Mairs* the arrested person had refused to submit to a blood test at a hospital after being requested to do so by the arresting officer. At some point during her stay at the hospital, Mairs had a blood sample taken by hospital personnel. Division One observed that nothing in the record indicated that "the test conducted by the hospital was performed in accordance with the procedures set forth in the regulations governing blood tests". 70 Wn. App. at 551. Because the court was unable to determine whether the tests were uniform and accurate, it overturned the trial court's determination that the driver had "effectively complied" with RCW 46.20.308. 70 Wn. App. at 551.

Lax attempts to distinguish *Currier* and *Mairs* by asserting that there were facts present in those cases that are not present here. He points out that in *Currier*, the arresting officer had already departed and significant time had elapsed since the suspect's initial refusal, and that in *Mairs*, the blood test that was eventually taken was not taken pursuant to regulatory procedures. Lax asserts that the delay in his case was only 12 minutes and, therefore, there was no danger of the delay prejudicing the result of the test. He makes the additional point that the blood sample was actu-

ally taken by hospital personnel, using presumably reliable procedures, and was given to the trooper and used at trial against Lax.

Although there are some differences between the facts in *Currier* and *Mairs* and the instant case, we disagree with Lax that a ruling in his favor can be reconciled with the holdings in *Currier* and *Mairs*. Those cases appear to establish a bright line rule that once a person has told an officer that he or she refuses to submit to a blood or breath test, no subsequent actions by the suspect can undo the refusal so as to avoid a license revocation. It would be a stretch to interpret those decisions as leaving open the possibility of exceptions to the bright line test.

## II

Lax also contends that even if *Currier* and *Mairs* cannot be distinguished, we should reject the bright line approach taken by Division One in those cases. We devote the remainder of the opinion to a consideration of that argument.

Two different approaches to this issue have emerged in the decisions of courts in other states. *See generally* M. Elizabeth Fuller, Comment, *Implied Consent Statutes: What Is Refusal?*, 9 Am. J. Trial Advoc. 423 (1986). Courts in some states have adopted a "flexible" rule that either allows subsequent consent to cure a prior refusal, or deems an initial refusal followed by subsequent consent not to be a legal refusal at all. *See, e.g., Pruitt v. State*, 825 P.2d 887 (Alaska 1992); *Gaunt v. Motor Vehicle Div.*, 136 Ariz. App. 424, 666 P.2d 524 (1983); *Zahtila v. Motor Vehicle Div.*, 39 Colo. App. 8, 560 P.2d 847 (1977); *Larmer v. State*, 522 So. 2d 941 (Fla. Dist. Ct. App.), *review denied*, 531 So. 2d 1352 (Fla. 1988); *Department of Pub. Safety v. Seay*, 206 Ga. App. 71, 424 S.E.2d 301 (1992); *State v. Moore*, 62 Haw. 301, 614 P.2d 931 (1980); *In re Smith*, 115 Idaho 808, 770 P.2d 817 (1989); *Standish v. Department of Rev.*, 235 Kan. 900, 683 P.2d 1276 (1984); *Pickard v. State*, 572 So. 2d 1098 (La. Ct. App. 1990), *writ not considered*, 576 So. 2d 22 (La. 1991); *Lund v. Hjelle*,

224 N.W.2d 552 (N.D. 1974); *Baldwin v. State ex rel. Department of Pub. Safety*, 849 P.2d 400 (Okla. 1993). These courts generally apply a balancing test that allows for the examination of the facts and circumstances that follow the initial refusal to ascertain whether a subsequent consent to take a blood or breath test will negate or make ineffective the earlier refusal.

On the other hand, courts in other states take the approach that Division One of this court took. It is a "bright line" rule that holds that an initial refusal to submit to testing cannot be cured or recanted by a subsequent agreement to be tested. *See, e.g., Webb v. Miller*, 187 Cal. App. 3d 619, 232 Cal. Rptr. 50 (1986); *People v. Shorkey*, 23 Ill. App. 3d 662, 321 N.E.2d 46 (1974); *Krueger v. Fulton*, 169 N.W.2d 875 (Iowa 1969); *Cummins v. Lentz*, 813 S.W.2d 822 (Ky. Ct. App. 1991); *State v. Landry*, 428 A.2d 1204 (Me. 1981); *Mossak v. Commissioner of Pub. Safety*, 435 N.W.2d 578 (Minn. Ct. App. 1989); *Johnson v. Division of Motor Vehicles*, 219 Mont. 310, 711 P.2d 815 (1985); *Wisch v. Jensen*, 221 Neb. 609, 379 N.W.2d 755 (1986); *Schroeder v. State*, 105 Nev. 179, 772 P.2d 1278 (1989); *Harlan v. New Hampshire*, 113 N.H. 194, 308 A.2d 856 (1973); *State v. Corrado*, 184 N.J. Super. 561, 446 A.2d 1229 (1982); *Commonwealth v. Stay*, 114 Pa. Commw. 532, 539 A.2d 57 (1988); *Leviner v. South Carolina Dep't of Hwys. & Pub. Transp.*, 438 S.E.2d 246 (S.C. 1993); *Peterson v. State*, 261 N.W.2d 405 (S.D. 1977). These courts hold generally that once a party has initially refused to take a blood or breath test, the refusal is absolute and a license suspension cannot be avoided even if the party changes his or her mind as quickly as several seconds later.

After carefully examining the reasoning behind each of the rules, we conclude that the flexible approach is the better and fairer rule.[8] We find the decision of the Court of

---

[8]*Wisch v. Jensen, supra*, from the Nebraska Supreme Court, provides a stark example of the inflexibility and potential unfairness of the bright line approach. There, a motorist initially refused to submit to a breath test. As the technician was at the door to leave the room, the motorist changed his mind and agreed to take the test. The time that elapsed between the initial refusal and change of mind was "not over 30 seconds". Nevertheless, the court concluded that the

Appeals in our neighboring state of Idaho, *Smith*, to be particularly persuasive. In that case, the Idaho court, interpreting an implied consent statute similar to our own, concluded that the better policy supported a holding "that if a motorist, having initially declined to take a test, reconsiders and gives a timely and unequivocal assent, he cannot be deemed to have 'refused' the test". 115 Idaho at 812. The court determined that as long as the delay was brief and would not materially affect the outcome of the test, the motorist was still in custody, and the police were not inconvenienced, then the initial refusal was essentially not a refusal at all. 115 Idaho at 811-12. In so holding, it reasoned that the rule allowing this delayed consent would further the ultimate policy behind the implied consent statute, which was to encourage motorists to cooperate in taking blood or breath tests so that blood alcohol content would be measured by the most precise scientific method available. 115 Idaho at 812; *see also State v. Moore,* 62 Haw. at 307; *Pruitt v. State,* 825 P.2d at 894.

We hold, as did the Idaho court, that in determining whether there has been a legal "refusal" under our implied consent statute, the court must look to more than the first words uttered by a suspect. Considering the less than ideal circumstances that generally surround an officer's request for a suspect to submit to a blood or breath test, it is a harsh form of justice that always gives final legal effect to a suspect's initial statement or indication that he or she refuses to submit to a test. It is, in our judgment, fairer to hold that if a suspect says that he or she refuses the test, but then proceeds promptly to submit to a test and provides the results to authorities, the initial refusal should not always be deemed a legal "refusal".

We agree with the reasoning of the Arizona Court of Appeals, which said:

Although an absolute rule preventing a subsequent consent after an initial refusal has the advantage of granting unmis-

---

motorist had already gone "beyond the point of no return" by the time he changed his mind.

takable clarity to the defendant's obligation under the implied consent law, it could lead to unnecessarily harsh and self-defeating results. It is not hard to imagine circumstances where the defendant, soon after declining to take the breath test, has second thoughts. If the test results would remain valid, and if no material inconvenience is caused to the police, we fail to see the harm in permitting the defendant to subsequently consent to take the test.

*Gaunt*, at 427; *see also* 4 Richard E. Erwin, *Defense of Drunk Driving Cases* § 33.07[5], at 33-116 to 33-123 (3d ed. 1989) (flexible rule is "more logical and fair").

In order to provide guidance to law enforcement officers who are called upon to enforce the provisions of our implied consent statute, we set forth hereafter several factors that a trier of fact should examine when considering if a suspect has, as a matter of law, refused to submit to a blood or breath test. These factors include whether: (1) the amount of time that has elapsed between the suspect's initial refusal and subsequent unequivocal assent is brief enough to ensure the reliability of the test results; (2) the suspect has been in police custody or under observation since his or her arrest; (3) the arresting officer is still in the suspect's presence and whether the delay in assenting to the test will prevent the officer from performing other duties or will inconvenience the officer; and (4) the testing equipment or facility is still available and convenient. The focus of all these factors is to ensure that any subsequent assent is timely, that the State is not prejudiced by the delay, and that the results obtained from the test are reliable.

■ Our adoption of a rule allowing a more flexible approach in these types of cases is based on two policy rationales. The first is to carry out the intent behind the implied consent statute. One purpose of RCW 46.20.308, the implied consent statute, is to provide "an efficient means of gathering reliable evidence of intoxication or nonintoxication". *Greenwood v. Department of Motor Vehicles*, 13 Wn. App. 624, 628, 536 P.2d 644, 98 A.L.R.3d 566 (1975); *see also Spokane v. Holmberg*, 50 Wn. App. 317, 323, 745 P.2d 49 (1987), *review denied sub nom. Box v. Grant Cy. Dist. Court*,

110 Wn.2d 1013 (1988); *Wolf*, 27 Wn. App. at 222. Permitting a person who initially refuses to take a blood or breath test to change his or her mind and submit to the test within a reasonable amount of time furthers that important policy. The flexible approach should promote the gathering of reliable evidence that may be used at any subsequent trial. In our judgment, a bright line test ignores that important purpose of the implied consent statute by rejecting the opportunity to secure reliable test results when the arrested person wishes to provide them.[9]

The second policy reason behind our adoption of the flexible approach is that it furthers the ability of law enforcement officers and courts to more fairly determine when a person actually refuses a test, as opposed to relying on the initially appealing but ultimately unsatisfactory concept of examining only the first words of refusal that the person utters. Holding a suspect to the first words spoken appears to us to be unnecessarily harsh and has the very great potential to achieve an unfair result. We believe that considerations of fundamental fairness dictate that, if circumstances permit, the suspect should be allowed to change his or her mind as long as the time delay is brief, the suspect remains in custody, the officer is not inconvenienced, and the equipment is still available.

We realize that the trier of fact in these cases has always engaged in an examination of the facts and circumstances to determine if a suspect has, in fact, initially "refused" to submit to a breath or blood test. That important analysis remains significant because if a suspect has not initially refused to take the test, then revocation of the driver's license is obviously improper. However, even after a suspect has said "I refuse" or otherwise manifested an initial refusal by word or act, in our opinion, the trier of fact should not have to reject from its consideration the possibility that a suspect later changed his or her mind. The trier of fact

---

[9]The United States Supreme Court has observed that "the inference of intoxication arising from a positive blood-alcohol test is far stronger than that arising from a refusal to take the test". *South Dakota v. Neville*, 459 U.S. 553, 564, 74 L. Ed. 2d 748, 103 S. Ct. 916, 922 (1983).

should be permitted to proceed to examine subsequent facts and circumstances to determine whether that initial refusal should be given any legal effect. If the person satisfies the criteria noted above and manifests clear subsequent assent to submit to a test, there has been no legal refusal under the statute, and no license revocation should follow.

In conclusion, we note, additionally, that the result we reach is consistent with the explicit statutory language contained in the implied consent statute. RCW 46.20.308(5) provides that if a person refuses a test, no test shall be given. RCW 46.20.308(6) provides that the person's license should be revoked upon receipt by the Department of an officer's affidavit stating that the person refused to submit to the test upon the request of the law enforcement officer. We hold that if a suspect, after initially refusing to submit to a blood or breath test, changes his or her mind and agrees to submit to such a test within a reasonable amount of time, there has been no legal refusal.

### III

Each one of the factors that we adopt today will normally be a fact-based inquiry for the trier of fact. However, because the pertinent facts in this case are undisputed and clear from the record, we will address whether Lax satisfied them. Here, it is apparent that Trooper Przygocki was still at the hospital in Lax's presence when Lax assented to have a blood sample drawn. Indeed, Lax had been in custody during that time. Przygocki was not, as far as we can tell from the record, delayed in performing his official duties while he was waiting for Lax to be released. Furthermore, the equipment to take a blood test was still available. Certainly the delay of 12 minutes was brief and cannot be said to have affected the reliability of the test results. All of these factors weigh in Lax's favor.[10] In addition, the State was not at all prejudiced by his

---

[10]Indeed, this case is a good example of why the flexible rule provides more fair and logical results. When Lax was asked to submit to a blood test, he was undergoing medical treatment. Wires were attached to his chest, and he had just been given an EKG test. Obviously, Lax was not in the most settled frame of mind. Nevertheless, after only 12 minutes, Lax had second thoughts, and decided to provide a blood sample.

initial refusal because it obtained his blood sample and had the benefit of it at trial.[11] Given the undisputed facts and circumstances surrounding the incident, we conclude that Lax did not, as a matter of law, "refuse" to take the blood test.

The trial court, thus, erred in affirming the Department's revocation of Lax's driver's license. We remand this matter to the trial court for entry of an order consistent with this opinion.

Reversed and remanded.

HOUGHTON, J., concurs.

SEINFELD, A.C.J. (dissenting) — I respectfully dissent. The majority bisects the term "refusal" into two component parts: factual refusal and legal refusal. It then proceeds, without any statutory basis, to establish a so-called flexible rule to determine when we will decline to treat a factual refusal as a legal refusal. According to the majority's opinion, if the factual refusal is not a legal refusal, the arresting officer must disregard the statutory consequences of the driver's unambiguous and unequivocal refusal to submit to a blood or breath test. In encouraging a case-by-case analysis of situations where a driver has second thoughts about his or her refusal to be tested, I believe we adopt a standard that is not only contrary to the language of the implied consent statute, but is also poor public policy.

I

Initially, it is important to note that Lax did not assign error to the trial court's finding of fact that he refused to allow the blood sample to be drawn at the time Trooper Przygocki made his initial request. Therefore, we accept as a verity on appeal that Lax unequivocally "refused" to submit to a blood test. *Metropolitan Park Dist. v. Griffith*, 106 Wn.2d 425, 433, 723 P.2d 1093 (1986). Furthermore, Lax never unequivocally withdrew his refusal to the trooper's

---

[11]That factor should not, however, be dispositive. If Przygocki had declined to accept the evidence or provide a breath or blood test, our result would be the same.

request. Rather, approximately 12 minutes after Lax's first refusal, a hospital nurse asked Lax if she could draw blood. Lax refused a second time. It was only after the trooper advised Lax that the nurse wished to draw blood for medical purposes that Lax consented to the blood draw, and then also inquired whether the trooper still wanted a blood sample, as well.

## II

The majority, nevertheless, concludes that we should disregard Lax's refusal in light of his later change of heart and subsequent consent to the drawing of blood. I disagree. This result is contrary to the explicit language of the implied consent statute, RCW 46.20.308.

RCW 46.20.308(6) provides that the Department of Licensing, upon receipt of a sworn report by an arresting officer that a suspect refused to submit to a test, "shall revoke the person's license or permit to drive . . .". When interpreting a statute, we must give effect to the plain meaning of the statutory language. *Cherry v. Municipality of Metro Seattle*, 116 Wn.2d 794, 799, 808 P.2d 746 (1991). Here, the statute is explicit and clear.

Nonetheless, the majority claims that the flexible rule "is the better and fairer rule" for persons arrested for driving under the influence of intoxicating liquor. Majority, at 14. Again, I disagree. The implied consent statute, RCW 46.20.308, contains many safeguards to protect the driver from an unfair revocation of his or her license to drive. We need not apply a judicial overlay of additional protections.

The statute requires the officer to advise the driver

of his or her right to refuse the breath or blood test, and of his or her right to have additional tests administered by any qualified person of his or her choosing as provided in RCW 46.61.506. The officer shall warn the driver that (a) his or her privilege to drive will be revoked or denied if he or she refuses to submit to the test, and (b) that his or her refusal to take the test may be used in a criminal trial.

RCW 46.20.308(2). The driver has a full and fair opportunity to consider the consequences attached to either choice, and

then has the opportunity to submit or refuse the test. This rule is fair to law enforcement and to the driver. *State v. Whitman Cy. Dist. Court*, 105 Wn.2d 278, 281-82, 714 P.2d 1183 (1986); *see Clyde Hill v. Rodriguez*, 65 Wn. App. 778, 786-87, 831 P.2d 149, *review denied*, 119 Wn.2d 1022 (1992); *Keefe v. Department of Licensing*, 46 Wn. App. 627, 632, 731 P.2d 1161, *review denied*, 108 Wn.2d 1018 (1987).

If the arresting officer classifies the driver's response as a refusal, the driver may challenge that characterization by requesting a formal hearing. RCW 46.20.308(7). At this hearing, the driver may challenge the facts surrounding the refusal. *Martinez v. Department of Licensing*, 70 Wn. App. 398, 402, 854 P.2d 43 (1993). The hearing officer must make findings of fact. RCW 46.20.332. If dissatisfied with the outcome of the formal hearing, the driver may then appeal to the superior court. RCW 46.20.334. The driver is entitled to a trial de novo in superior court. RCW 46.20.334; *Burnett v. Department of Licensing*, 66 Wn. App. 253, 832 P.2d 1321 (1992). The Department of Licensing has the burden at a trial de novo to prove that the driver refused to take the test. *Martinez*, 70 Wn. App. at 402, 403. The trial court, in a trial de novo pursuant to the statute, must consider all the facts and circumstances surrounding the incident to determine if there was an unambiguous refusal. *Wolf v. Department of Motor Vehicles*, 27 Wn. App. 214, 217, 616 P.2d 688 (1980).

### III

Furthermore, the majority's decision is inconsistent with good public policy. It permits an arrested driver to unequivocally refuse, then change his or her mind, and have the court relabel the initial refusal as a nonlegal refusal. In so doing, it provides the arrested driver an opportunity to manipulate and negotiate — first refusing, then consenting. Our new "flexible approach" also places an unnecessary additional burden on law enforcement. Upon receipt of a refusal, the officer cannot automatically move to his or her next official duty. Instead, the officer, faced with an ambivalent driver, will need to decide whether the driver's initial refusal was a

legal refusal or merely a factual refusal. The officer will have to weigh and balance the driver's possible multiple changes of mind to determine if they occurred within a "reasonable time" or satisfied the other factors established by the majority. The officer then may be further detained by the necessity of rewriting his or her report. Meanwhile, the officer will be unavailable to deal with other, perhaps more urgent, needs.

A New Jersey court, faced with the same issue that we deal with today, commented:

> We are persuaded that a bright line rule should be adopted, consistent with a growing majority of other jurisdictions with a similar implied consent law, which precludes a defendant from curing a refusal.

*State v. Bernhardt*, 245 N.J. Super. 210, 217, 584 A.2d 854 (1991).

Along with statutory and case analysis, the *Bernhardt* court supported its decision with a review of the policy implications of allowing a "cure" of a refusal, particularly noting "our strong public policy of removing drunken drivers from our highways". *Bernhardt*, at 219.

The rule we adopt today obscures the law, and will foster delay and indecision. In light of the clarity of the implied consent statute and its ample protections for arrested drivers, along with the benefits to law enforcement of clear, straightforward procedures, I believe the *Currier* court's so-called "bright line" rule is correct. I would affirm the revocation of Lax's driver's license.

Review granted at 125 Wn. 2d 1001 (1994).