877 P.2d 1088 (1994)
117 N.M. 784
In the Matter of the Administrative Revocation Hearing of Abel G. SUAZO.
STATE of New Mexico, Plaintiff-Petitioner,
v.
Abel G. SUAZO, Defendant-Respondent.
No. 21165.
Supreme Court of New Mexico.
June 23, 1994.
*1089 Tom Udall, Atty. Gen. and Bruce J. Fort, Sp. Asst. Atty. Gen., Taxation and Revenue Dept., Santa Fe, for petitioner.
Carlos F. Vigil, Santa Fe, for respondent.

OPINION
FROST, Justice.
The New Mexico Implied Consent Act, NMSA 1978, Sections 66-8-105 through 66-8-112 (Repl.Pamp.1987 & Cum.Supp.1993), provides that a motorist, upon refusing to take a blood-alcohol test after being arrested for driving under the influence of alcohol, shall have his or her driver's license suspended for one year. Section 66-8-111(A) & (B) (Repl.Pamp.1987). We granted certiorari to decide whether a subsequent change of mind can nullify the motorist's initial refusal to take the blood-alcohol test.
We resolve the issue against the motorist and reverse in part the opinion of the court of appeals. We also take this opportunity to establish criteria that, under limited circumstances, would permit a motorist to "cure" an initial refusal to take a sobriety test.

I. FACTS
On January 11, 1990, about 9:30 p.m. Defendant-Appellee Abel G. Suazo was involved in a two-vehicle accident near Espanola, New Mexico. Officer James Henderson, of the New Mexico State Police, was dispatched to the scene. Though he detected alcohol on Suazo's breath, he permitted Suazo to go to Espanola Hospital to be with his daughter who was injured in the accident.
At the hospital the officer gave Suazo a field sobriety test in which he was unsteady and unable to follow instructions when told to walk and turn, walk heel to toe, and stand on one foot. Based on the field sobriety test, Suazo was arrested and asked to take a breathalyzer test to determine his blood alcohol content (BAC) according to Section 66-8-107 (Repl.Pamp.1987). Officer Henderson advised Suazo that, as specified in Section 66-8-111 parts (A) and (B) of the Implied Consent Act, refusal to take the test would result in revocation of his license for one year. Suazo agreed to take the test and between 10:56 and 10:57 p.m. he made three *1090 attempts. On each attempt he did not breathe hard enough or long enough to obtain an adequate breath sample. Though he said nothing at the time, and although Henderson saw no physical reason for Suazo's inability to take the test, Suazo later claimed he could not generate enough air pressure because of injuries surrounding his mouth.
Officer Henderson determined that Suazo's failures were willful and amounted to a refusal to take the test. He noted this observation on the "Notice of Revocation and Right to Hearing" form and informed Suazo his license was revoked for one year based on his refusal to submit to a chemical test. Henderson drove Suazo to the Santa Fe County Detention Center. En route, Suazo requested to be taken to St. Vincent's hospital for medical treatment. At the hospital Suazo called his attorney, who came to St. Vincent's from Espanola to discuss the incident with Henderson. On his lawyer's advice, Suazo agreed to take a blood test. About 1:15 a.m., January 12, 1990, the test was administered, three hours and forty-five minutes after the accident, and two hours and fifteen minutes after the initial refusal to take the test. The test showed a BAC of.04% by weight.
At the hearing on Suazo's license revocation at the Motor Vehicle Division of the Taxation and Revenue Department (MVD), the hearing officer determined that Suazo's failure to complete the breathalyzer test in Espanola constituted a refusal to take the test and upheld revocation of his license for one year. On appeal, the district court reversed the hearing officer's decision, finding that the failure to register a result on the breathalyzer was not a refusal to be tested, and that the subsequent blood test cured any initial refusal. The Court of Appeals disagreed, stating that Suazo's conduct was a refusal. That Court then established criteria which would permit a motorist to rescind a prior refusal, and remanded the case with instructions for the MVD to evaluate Suazo's conduct under those criteria. We only review the Court of Appeals' determination regarding the motorist's right to rescind an initial refusal.

II. RELEVANT STATUTE
The incident took place on January 11, 1990, and we apply the law in effect on that date. However, we note that our findings would not differ under the most recent amendments to this Implied Consent Act. The essence of the Act is that any person who operates a motor vehicle in New Mexico, after being arrested for driving while intoxicated, "shall be deemed to have given consent" to a chemical test to determine the drug or alcoholic content of the motorist's blood. Section 66-8-107(A). A police officer must have reasonable grounds to believe that a motorist, arrested for any violation of the Motor Vehicle Code, NMSA 1978, §§ 66-1-1 to 66-8-140 (Repl.Pamp.1989, Repl. Pamp.1987 & Cum.Supp.1993), may be driving while under the influence of intoxicating liquor. Based on these reasonable grounds, the officer may request that the motorist submit to a chemical test. If the motorist refuses, "none shall be administered." Section 66-8-111(A). Thereafter, the director of MVD will revoke the motorist's New Mexico driver's license for one year upon receiving a signed statement from the arresting officer that there were reasonable grounds to believe the motorist was driving while intoxicated, that the officer had requested the motorist to take the chemical test, that the motorist was informed of the consequences of refusing, and that the motorist thereafter refused to take the test. Section 66-8-111(B).

III. IS THE REFUSAL TO TAKE A BLOOD ALCOHOL TEST CURED BY A SUBSEQUENT CHANGE OF MIND?
All fifty states have adopted implied consent laws. See Lively v. State, 804 P.2d 66, 69 (Alaska Ct.App.1991). While many states have questioned whether the initial refusal of a blood alcohol test can be cured by a subsequent recantation, no single answer to this question predominates. There are two main lines of thought: those that prescribe an absolute rule allowing no change of mind under any circumstance, and those that offer a flexible rule, permitting a change of mind within specified limits.

*1091 A. The Absolute Rule
Those advocating an absolute rule frequently echo the words of State v. Corrado, 184 N.J.Super. 561, 446 A.2d 1229, 1233 (1982):
[A]nything substantially short of an unqualified, unequivocal assent to an officer's request that the arrested motorist take the test constitutes a refusal to do so. [(Citation omitted.)] The occasion is not one for debate, maneuver or negotiation, but rather for a simple "yes" or "no" to the officer's request.
[(Citation omitted.)]
The State argues that Suazo's refusal cannot be cured by subsequent consent to another test.
A number of policy arguments are raised in support of this position. The chief purpose behind the Implied Consent Act is to get drunk drivers off the road. McKay v. Davis, 99 N.M. 29, 30, 653 P.2d 860, 861 (1982). The arrestee should not undermine the Act by being permitted to equivocate. To introduce leniency into a perfectly explicit statute does not serve either the legal community or the public at large. By requiring a driver to take a blood alcohol test, those who are too impaired to drive can be quickly and accurately identified. Their case can be efficiently and fairly processed by the MVD and those who drive while intoxicated will suffer the consequences of their conduct and be deterred from making the same mistake again. Cf. State v. Wiberg, 107 N.M. 152, 156, 754 P.2d 529, 533 (Ct.App.) (stating the purpose of the Act is "to deter drunk driving and to aid in discovering and removing intoxicated drivers from the highways"), cert. denied, 107 N.M. 106, 753 P.2d 352 (1988); State v. Bernhardt, 245 N.J.Super. 210, 584 A.2d 854, 858 (1991) (stating that a bright-line rule removes obstacles to the effective and efficient prosecution of drunk drivers), cert. denied, 126 N.J. 323, 598 A.2d 883 (1991). Motorists who refuse the chemical test undermine this system. The State does not want to give them a second chance.
The State also suggests that a subsequent cure rule will encourage drivers to delay the test as long as possible. In Bierner v. State, the New Mexico Court of Appeals established that the fact finder should base decisions on the BAC at the time of the test, not at the time of driving. 113 N.M. 696, 698-701, 831 P.2d 995, 997-1000 (Ct.App.1992). This standard eases the administrative burden by confining the fact finder's focus to an empirical measurement, not an inferential estimate. This standard should not be exploited by arrestees who hope to register a lower BAC by stalling the taking of the test. The State does not want to invite speculation into how much Suazo's BAC would have dropped in the two hours and fifteen minutes since his refusal. When he was arrested, he failed the field sobriety test, and was possibly responsible for the accident in which his own daughter was injured. It is simply inappropriate to permit this kind of driver to defeat the purpose of the Implied Consent Act by being uncooperative with the police. See Schroeder v. State, 105 Nev. 179, 772 P.2d 1278, 1280 (1989) (citing Noli v. Department of Motor Vehicles, 125 Cal.App.3d 446, 178 Cal.Rptr. 5, 7 (1981)).
Specific to the New Mexico Implied Consent Act are certain provisions designed to promote efficiency. The Act explicitly limits the administrative hearing to five issues:
The hearing shall be limited to the issues:
(1) whether the law enforcement officer had reasonable grounds to believe that the person had been driving a motor vehicle within this state while under the influence of intoxicating liquor;
(2) whether the person was arrested;
(3) whether this hearing is held no later than ninety days after notice of revocation; and either
(4)(a) whether the person refused to submit to a test upon request of the law enforcement officer; and
(b) whether the law enforcement officer advised that the failure to submit to a test could result in revocation of his privilege to drive; or
(5)(a) whether the chemical tests were administered pursuant to the provisions of the Implied Consent Act [66-8-105 to 66-8-112 NMSA 1978]; and
(b) the test results indicated a blood alcohol content of one-tenth of one percent *1092 or more by weight if the person is eighteen years of age or older or a blood alcohol content of five one-hundredths of one percent or more by weight if the person is less than eighteen years of age.
Section 66-8-112(E) (Repl.Pamp.1987).
If a subsequent cure rule were adopted, the State claims this would have the effect of adding a sixth issue: whether a subsequent offer to submit to the BAC test had cured the initial refusal. As the State points out, when the statute lists five issues, it means no more than five. "To make it possible for the MVD to conduct the numerous necessary hearings within the time constraints of the Implied Consent Act, the legislature could reasonably decide to limit the issues to be considered at such a hearing." Bierner, 113 N.M. at 699, 831 P.2d at 998; see also State ex rel. Taxation & Revenue Dep't Motor Vehicle Div. v. Van Ruiten, 107 N.M. 536, 538, 760 P.2d 1302, 1304 (Ct.App.) ("[T]he administrative hearing is limited to certain issues...."), cert. denied, 107 N.M. 413, 759 P.2d 200 (1988).
The State is concerned also that a subsequent consent rule could add evidentiary complexities to the administrative hearing that would destroy the efficiency that underlies the statute's design. See Johnson v. Division of Motor Vehicles, 219 Mont. 310, 711 P.2d 815, 818 (1985) (quoting Hoyle v. Peterson, 216 Neb. 253, 343 N.W.2d 730, 734 (1984)). It would be necessary to determine if the delay had affected the accuracy of the chemical test. It is possible to use experts to extrapolate the BAC many hours after a person's last drink. See Lund v. Hjelle, 224 N.W.2d 552, 557 (N.D.1974); see also Wanna v. Miller, 136 N.W.2d 563, 566-68 (N.D.1965) (holding admissible a blood test taken eight hours after driver's last drink). However, an essential aspect of the New Mexico Implied Consent Act is to make hearings expedient and to avoid the need for expert testimony.
The State argues that permitting a subsequent recantation would place an unreasonable burden on police officers. If an initial refusal of the test could be merely conditional, the officer would have to neglect other duties while waiting for an indeterminate length of time to see if the arrestee had second thoughts. See Schroeder, 772 P.2d at 1280; Blanchard v. Director of Revenue, 844 S.W.2d 589, 590 (Mo.Ct.App.1993) ("[A]n officer should not be required to determine whether a driver actually means `no' when he or she refuses to submit to the breathalyzer."). If the police decide too much time has elapsed, they are placed in the position of refuting the arrestee's claim that they "improperly disallowed a cure." Bernhardt, 584 A.2d at 858. If the police permit a cure, they must endure the inconvenience of arranging for a belated test. See Johnson, 711 P.2d at 818 (quoting Hoyle, 343 N.W.2d at 734).

B. The Flexible Rule
Those who advocate a flexible rule argue that it is more fair to the arrestee. Great injustice could result from a bright-line "rule of law which would rigidly and unreasonably bind an arrested person to his first words spoken, no matter how quickly and under what circumstances those words are withdrawn." State v. Moore, 62 Haw. 301, 614 P.2d 931, 935 (1980). The arrested motorist might suffer from momentary confusion or fear leading to "unnecessarily harsh and self-defeating results," Gaunt v. Motor Vehicle Div., 136 Ariz. 424, 427, 666 P.2d 524, 527 (1983). When the Implied Consent Act is put into practice "out on the streets" with the police officer face-to-face with an apparently intoxicated driver, the officer typically offers the arrestee several chances to refuse the test. See Baldwin v. State ex rel. Dep't of Pub. Safety, 849 P.2d 400, 405-06 (Okla. 1993). "Arresting officers apparently recognize that the circumstances of the arrest along with the altered mental state of a drunk driver could result in an initially rash decision, which a few minutes of reflection by a ride to a jail in a patrol car could correct." Id.
Moreover, arrestees often need to be given a few moments to be disabused of the common misconception that they have the right to talk to an attorney before submitting to the test. E.g. Schultz v. Commissioner of Pub. Safety, 447 N.W.2d 17, 18 (Minn.Ct. App.1989) (quoting Nyflot v. Commissioner of Pub. Safety, 369 N.W.2d 512, 517 n. 4 (Minn.), appeal dismissed, 474 U.S. 1027, 106 *1093 S.Ct. 586, 88 L.Ed.2d 567 (1985)); Smith v. State (In re Smith), 115 Idaho 808, 810, 770 P.2d 817, 819 (App.1989) (citing State v. Ankney, 109 Idaho 1, 5-6, 704 P.2d 333, 337-38 (1985)). In the bewildering moments after an arrest, especially after an auto accident, when the defendant can be inebriated and fearful and confused, proponents argue it is only fair to permit the driver to have second thoughts about submitting to a blood alcohol test.
The flexible rule also furthers the purposes of the Implied Consent Act by encouraging the administering of blood alcohol tests in as many cases as possible. Pruitt v. State Dept. of Public Safety, 825 P.2d 887, 894 (Alaska 1992) (quoting Lively, 804 P.2d at 70); Standish v. Department of Revenue, 235 Kan. 900, 683 P.2d 1276, 1280 (1984) (stating that "administration of the test should be encouraged and the person arrested should be given every reasonable opportunity to submit to it"). The state has a strong interest in obtaining evidence from a chemical test because "the inference of intoxication arising from a positive blood-alcohol test is far stronger than that arising from a refusal to take the test." South Dakota v. Neville, 459 U.S. 553, 564, 103 S.Ct. 916, ___, 74 L.Ed.2d 748 (1983). The blood test provides the most accurate method of establishing whether the driver is under the influence of intoxicating liquors. This can strengthen the cases of either the state or the defendant, and it protects the motorist from being prosecuted based on speculation and inferential evidence. See Gaunt, 136 Ariz. at 427, 666 P.2d at 527 (citing Campbell v. Superior Ct., 106 Ariz. 542, 546-48, 479 P.2d 685, 689-91 (1971) (en banc)). For these reasons, proponents of the flexible rule urge that the motorist should be given every reasonable opportunity to take the test. Standish, 683 P.2d at 1280.

IV. FLEXIBLE RULE TESTS
Among the other forty-nine states and District of Columbia, it appears that twelve jurisdictions have not addressed this precise issue.[1] The majority of jurisdictions have adopted a bright-line rule, declining to permit the driver a change of mind.[2] A few states have not directly addressed this issue *1094 but have indicated in dicta that a change of mind would not expunge an initial refusal.[3]
States adopting a flexible rule have suggested different tests by which a driver may vitiate a prior refusal. One of the most comprehensive tests was first advanced by the Supreme Court of North Dakota in the case Lund v. Hjelle. We refer to this five-part test as the Lund test:
[W]e hold that where, as here, one who is arrested for driving while under the influence of intoxicating liquor first refuses to submit to a chemical test to determine the alcoholic content of his blood and later changes his mind and requests a chemical blood test, the subsequent consent to take the test cures the prior first refusal [1] when the request to take the test is made within a reasonable time after the prior first refusal; [2] when such a test administered upon the subsequent consent would still be accurate; [3] when testing equipment or facilities are still readily available; [4] when honoring a request for a test, following a prior first refusal, will result in no substantial inconvenience or expense to the police; and [5] when the individual requesting the test has been in police custody and under observation for the whole time since his arrest.
Lund, 224 N.W.2d at 557. Other courts have adopted this test, sometimes calling it the "Moore test" after a Hawaiian Supreme Court opinion written six years after Lund.[4]See Moore, 614 P.2d at 935. In a refinement of the Lund test, Standish narrowed the amount of time in which a driver could recant from a "reasonable time" to "within a very short and reasonable time after the prior first refusal."[5]Standish, 683 P.2d at 1280. Suazo would fail both the Lund and the Standish tests because his second request did not come within a reasonable time (two hours and fifteen minutes later), because the testing equipment was probably no longer available at the time of his recantation, and because the trip to St. Vincent's hospital was arguably an unwarranted expense and inconvenient to the police.
Other flexible rule states have created tests which essentially reformulate the five Lund criteria. For example, the Idaho Court of Appeals established a three-part test:
(a) The assent must be given while the motorist is still in police custody. (b) It must be given at a time when the police would not be unduly inconveniencedfor example, when the officer who would administer the test has become unavailable. (c) The assent must be given before the delay would materially affect the outcome of the test.
Smith, 770 P.2d at 820. This Idaho test was further amplified by a later case which suggested the possibility of a cure if the driver could "show a cause of sufficient magnitude, such as a demonstrated physical or psychological inability to perform the requested test, that it may fairly be said the suspension of driving privileges would be unjust or inequitable." Cummings v. State (In re Cummings), 118 Idaho 800, 803, 800 P.2d 687, 690 (App.1990) (citing State v. Griffiths (In re Griffiths), 113 Idaho 364, 372, 744 P.2d 92, 100 (1987) (holding that "a fear of needles *1095 may establish cause for refusing to submit to a blood test ... if the fear is of such magnitude that as a practical matter the defendant is psychologically unable to submit to the test, and if the fear is sufficiently articulated to the police officer at the time of refusal")).[6]
Other flexible rule states have offered criteria that are variations of the Lund tests. Several courts have adopted an "almost immediate" test where the driver's recantation was not substantially separated in time or place or conduct from the initial refusal. See Schultz, 447 N.W.2d at 19.[7] The Colorado Court of Appeals succinctly stated that a refusal could be established if the "delay would materially affect the result of that test." Zahtila v. Motor Vehicle Div., 39 Colo.App. 8, 560 P.2d 847, 849 (1977). Though concerned primarily with other issues, the Delaware Superior Court stated in dicta that the implied consent "statute obviously was not intended to preclude an accused from changing his mind and consenting to the test." State v. Lynch, 274 A.2d 443, 444 (Del.Super.Ct.1971).

V. THE NEW MEXICO FLEXIBLE RULE TEST
We adopt a subsequent consent rule for New Mexico. The tests offered by other states are instructive, but seem to us lacking in specificity, especially concerning the length of time a driver should be permitted to reflect upon his decision. Not even an approximate consistency can be found among courts attempting to establish an acceptable time period during which the motorist can recant. Courts permitting a subsequent cure have excused delays as short as twelve minutes, State v. Lax, 74 Wash.App. 7, 871 P.2d 1098 (1994), and as long as one hour, Lund, 224 N.W.2d at 554-55.[8] Bright-line courts have refused to accept delays as short as an "immediate change of heart," Blanchard, 844 S.W.2d at 590-91, and as long as "approximately two hours and forty minutes," State v. Greene, 173 Wis.2d 308, 498 N.W.2d 914 (Wis.Ct.App.1992). Between these extremes there is no agreement.[9] Any acceptable standard must present a narrow window of *1096 time within which the motorist must make a decision to take or refuse the BAC test.[10]
We adopt the Lund test with a stricter standard regarding the temporal criterion. A motorist will be permitted to rescind his initial refusal
(1) when he does so before the elapse of the reasonable length of time it would take to understand the consequences of his refusal;
(2) when such a test would still be accurate;
(3) when testing equipment or facilities are still readily available;
(4) when honoring a request for a test, following a prior first refusal, will result in no substantial inconvenience or expense to the police; and
(5) when the individual requesting the test has been in police custody and under observation for the whole time since his arrest.
See Lund, 224 N.W.2d at 557.
We believe this test will answer the concerns of both advocates and opponents of a bright-line rule by enhancing the policy of removing drunk drivers from the highways through an increase in the number of BAC tests, by denying drivers any opportunity for significant delay, by introducing no new issues into the efficient administrative license-revocation hearing, by easing the burden of police officers by strictly limiting the motorist's time to equivocate, and by offering the flustered motorist a fair chance to understand his or her rights.
The temporal standard we suggest in the first criterion will always be a very short time, never more than a matter of minutes. The time period we prescribe is shorter than the Lund cases have allowed. We offer a standard of reasonableness because the officer should not be forced to coddle a person who has willfully brought himself to an unreasonable state of mind. The last four criteria will aid in evaluating borderline situations. The burden will be on the driver to prove the elements of the test we adopt today.
A hint of the pragmatic application of this rule can be found in decisions like Schultz, 447 N.W.2d at 18-19, which apply the "almost immediate" standard. In Schultz, though the implied consent advisory was thrice explained to the driver, and he was then permitted to read the advisory, he refused a breath test because he claimed he did not understand the law. Id. at 18. After the officer noted the refusal on the implied consent form, the driver said, "Wait, I want to change that." Id. The officer did not administer the test and the driver's license was revoked. Id. at 18. The Court of Appeals of Minnesota reversed, noting that the driver's recantation "was almost immediate, and was not separated from his initial response by any substantial time, place, or a telephone call to counsel or a friend." Id. at 19. Also important was the fact that "[t]he officer had not completed his processing of appellant's case." Id. "Immediate" in this context means "without loss of time." Webster's Third New International Dictionary 1129 (1976). Strictly speaking, a change of mind after four presentations of the implied consent advisory is not "almost immediate." While the New Mexico test encourages the driver to recant "almost immediately," the inexact use of those two words induces us to adopt a standard measured by the driver's *1097 reasonable ability to comprehend his situation. Under the New Mexico test, the defendant in Schultz would have recanted his refusal within a reasonable time. In contrast, Suazo's change of mind came much too late.

VI. CONCLUSION
Though we do not prescribe a specific time limit, based on the criteria here established, we readily conclude as a matter of law that Suazo's change of mind after two hours and fifteen minutes was unreasonable. We remand this matter to the Court of Appeals for entry of a mandate to the district court to amend its order consistent with this opinion.
IT IS SO ORDERED.
RANSOM and FRANCHINI, JJ., concur.
MONTGOMERY, C.J., not participating.
BACA, J., specially concurs.
BACA, Justice (specially concurring).
I concur with the majority in affirming the suspension of Suazo's driver's license for one year. I do not, however, concur in the majority's adoption of a subsequent consent rule that permits a driver to cure an initial refusal to take a blood-alcohol test by later consenting to the test. I believe that the plain language of the Implied Consent Act (The "Act") permits no opportunity to cure an initial refusal to submit to the blood-alcohol test. Section 66-8-111(A) states that once an arrestee refuses a law enforcement officer's request to submit to chemical tests, no tests shall be administered. Under Section 66-8-111(B), the Director of MVD must revoke the arrestee's driver's license once refusal to submit to the tests has been established. These provisions provide no window of opportunity for an arrestee to cure an initial refusal through subsequent consent.
The underlying reason the Act does not provide an opportunity to cure an initial refusal is found in Section 66-8-107(A), which states in pertinent part:
[a]ny person who operates a motor vehicle within this state shall be deemed to have given consent ... to chemical tests of his breath or blood ... for the purpose of determining the drug or alcoholic content of his blood if arrested for any offense arising out of the acts alleged to have been committed while the person was driving... under the influence of an intoxicating liquor or ... drug.
(Emphasis added.) This provision recognizes that operating a motor vehicle in New Mexico is a privilege, not a right, and that a person operating a motor vehicle within the state automatically agrees to consent to chemical tests as part of the privilege of driving. In other words, consent is already given the moment a person commences operation of a motor vehicle on state highways and streets, and later refusal to submit to the test in the face of arrest breaks this implied covenant with the state, thereby subjecting the driver to mandatory revocation of the driving privilege.
Perhaps the opportunity to reasonably cure an initial refusal to take a blood-alcohol test is justifiable. As the majority points out, a driver may suffer from momentary fear or confusion when faced with arrest. Momentary fear or confusion may cause the driver to initially refuse to take the chemical tests. The Act, however, sets out a bright line rule providing no opportunity to cure the initial refusal under any circumstances. I would leave to the legislature the task of modifying this bright line rule. See State v. Ortega, 112 N.M. 554, 575, 817 P.2d 1196, 1217 (1991) (Baca, J., concurring in part, dissenting in part) (stating "it is our duty not to replace the legislature's judgment with our own").
NOTES
[1] Alabama, Arkansas, Indiana, Maryland, Massachusetts, Michigan, Mississippi, Rhode Island, Tennessee, Texas, Virginia, Wyoming.
[2] States adopting a bright-line test include: California, Zidell v. Bright, 264 Cal.App.2d 867, 71 Cal.Rptr. 111, 112-13 (1968); Illinois, People v. Graziano, 151 Ill.App.3d 475, 104 Ill.Dec. 325, 328, 502 N.E.2d 822, 825 (1986), but see People v. Naseef, 127 Ill.App.3d 70, 82 Ill.Dec. 204, 207, 468 N.E.2d 466, 469 (1984) (not expressly overruled by Graziano, stating that "[w]e do not believe that the legislature intended that a `refusal' exist, for purposes of the statute, where a suspect initially declines to take the test but ultimately agrees to take and does complete the test"); Iowa, Hoffman v. Iowa Dep't of Transp., 257 N.W.2d 22, 26 (Iowa 1977); Kentucky, Humphries v. Commonwealth, 807 S.W.2d 669, 670 (Ky.Ct.App.1991); Maine, State v. Landry, 428 A.2d 1204, 1206 (Me.1981); Missouri, Dudenhoeffer v. Director of Revenue, 780 S.W.2d 701, 703 (Mo.Ct.App.1989); but see Albrecht v. Director of Revenue, 833 S.W.2d 40, 42 (Mo.Ct. App.1992) ("[W]here an individual requests and is denied reasonable opportunity to contact an attorney before deciding whether or not to submit to a breathalyzer, revocation is not unequivocal and cannot be upheld."); Montana, Johnson, 711 P.2d at 817-18; Nebraska, Hoyle, 343 N.W.2d at 734; but see Sedlacek v. Pearson, 204 Neb. 625, 284 N.W.2d 556, 558 (1979) (not expressly overruled by Hoyle, permitting a delay, stating that "[t]here would appear to be no reason to invoke the sanction of the implied consent law for refusal to submit to a test where a test was in fact performed and the test established what the test was designed for and intended to show"); Nevada, Schroeder, 772 P.2d at 1280; New Jersey, Bernhardt, 584 A.2d at 857 (disapproving of State v. Ginnetti, 232 N.J.Super. 378, 556 A.2d 1339, 1341 (1989), cited by both parties as authority permitting a cure); New York, Nicol v. Grant, 117 A.D.2d 940, 499 N.Y.S.2d 247, 248 (1986); North Carolina, Mathis v. North Carolina Div. of Motor Vehicles, 71 N.C.App. 413, 322 S.E.2d 436, 438 (1984); Oregon, Bergstrom v. Motor Vehicles Div., 104 Or.App. 141, 799 P.2d 673, 674 (1990); Pennsylvania, Commonwealth v. Schaefer, 8 Pa.Cmwlth. 96, 300 A.2d 907, 907-08 (1973); South Carolina, Leviner v. South Carolina Dep't of Highways & Pub. Transp., 438 S.E.2d 246, 248 (S.C.1993); South Dakota, Peterson v. State, 261 N.W.2d 405, 410-11 (S.D.1977); Utah, Conrad v. Schwendiman, 680 P.2d 736, 738 (Utah 1984); Wisconsin, State v. Greene, No. 92-1811-CR, 1992 WL 464063, at *1-2, [173 Wis.2d 308, 498 N.W.2d 914 (table) ] (Wis.Ct.App. Dec. 17, 1992).
[3] Jurisdictions stating in dicta that a driver is bound to an initial refusal include: Connecticut, Chipman v. DelPonte, No. CV90 03 27 35S., 1990 WL 275841, at *3 (Conn.Super.Ct. Oct. 24, 1990) (holding subsequent consent to test at hospital did not excuse refusal of test at police station); District of Columbia, Marshall v. District of Columbia, 498 A.2d 190, 192 (D.C.1985) (stating where main issue was forcible removal of blood from driver"[o]n the facts of this case, we hold that appellant's request to take the breath test, after twice refusing to do so ... was unreasonable."); Vermont, State v. Lynaugh, 148 Vt. 124, 530 A.2d 555, 558 (1987) (stating that after "prolonged interchange" with driver, and after repeated refusals to take test, driver's decision to take test was too late); West Virginia, Moczek v. Bechtold, 178 W.Va. 553, 554-55, 363 S.E.2d 238, 239-40 (1987) (stating that driver who three times refused to take test would have license suspended even though he later demanded blood test under statute which permits an additional chemical test to supplement the one chosen by police).
[4] Other states adopting the Lund test include: Alaska, Pruitt, 825 P.2d at 893-94; Hawaii, Moore, 614 P.2d at 935; Louisiana, Pickard v. State, 572 So.2d 1098, 1101 (La.Ct.App.1990), cert. denied, 576 So.2d 22 (La.1991).
[5] Other states adopting the Standish test include: Georgia, Department of Pub. Safety v. Seay, 206 Ga.App. 71, 424 S.E.2d 301, 302 (1992), cert. denied; Oklahoma, Baldwin, 849 P.2d at 406.
[6] Other states creating tests which reformulate the Lund criteria include: Arizona, Gaunt, 136 Ariz. 428, 666 P.2d at 528 (offering a four-factor test); Florida, Larmer v. State, 522 So.2d 941, 944 (Fla.Dist.Ct.App.) (utilizing three of the Lund criteria), cert. denied, 531 So.2d 1352 (1988); Washington, State v. Lax, 74 Wash.App. 7, 871 P.2d 1098, 1102 (Wash.Ct.App.1994) (offering a four-part test, stating "[t]he focus of all these factors is to ensure that any subsequent assent is timely, that the State is not prejudiced by the delay, and that the results obtained from the test are reliable").
[7] States adopting an "almost immediate" test include: Minnesota, Parsons v. Commissioner of Pub. Safety, 488 N.W.2d 500, 502-03 (Minn.Ct. App.1992) (holding that "[o]nce a driver refuses testing a subsequent change of heart does not require the officer to provide testing," but encouraging "officers to be flexible and to disregard a refusal which is promptly withdrawn") (citing Schultz, 447 N.W.2d at 19); New Hampshire, Harlan v. State, 113 N.H. 194, 308 A.2d 856, 858-859 (1973) (holding no duty to administer a test "once a substantial period has elapsed from the initial refusal," but suggesting that the test can be administered if driver "almost immediately" retracts refusal); Ohio, In re Brooks, 27 Ohio St.2d 66, 271 N.E.2d 810, 812-13 (1971) (holding that a change of mind within one half hour still constituted a refusal), expanded by Bowman v. McCullion, 21 Ohio App.3d 138, 486 N.E.2d 1225, 1227 (Ohio Ct.App.1985) (indicating test would not be considered refused if motorist "almost immediately" retracts his or her refusal; each case would stand on its own facts in establishing whether retraction was "almost immediate").
[8] In Lund, the driver changed his mind after talking to his insurance agent one hour after his initial refusal. A blood test was administered one half hour later at a hospital, but was inadmissible because an alcohol swab had been used. The driver returned to the hospital for a second test which was administered three hours after his initial refusal. Lund, 224 N.W.2d at 554-55.
[9] Acceptable delays among courts that, under some circumstances, permit a cure: thirteen minutes, Moore, 614 P.2d at 935; ten to twenty minutes, Smith, 770 P.2d at 821-22; twenty-five minutes, Zahtila, 560 P.2d at 849.

Unacceptable delays among courts advocating an absolute test: thirty seconds, Wisch v. Jensen, 221 Neb. 609, 379 N.W.2d 755, 757-58 (1986); five minutes, Bowman v. McCullion, 21 Ohio App.3d 138, 486 N.E.2d 1225, 1226-27 (1985); five or ten minutes; Mossak v. Commissioner of Pub. Safety, 435 N.W.2d 578, 579-80 (Minn.Ct. App.1989); seven minutes, Hoyle, 343 N.W.2d at 732; fifteen to thirty minutes, Standish, 683 P.2d at 1279-1280; twenty minutes, Skinner v. Motor Vehicles Div., 107 Or.App. 429, 812 P.2d 46, 47 (1991); one half hour, In re Brooks, 27 Ohio St.2d 66, 271 N.E.2d 810, 812-13 (1971); thirty to forty-five minutes, Zidell v. Bright, 264 Cal. App.2d 867, 71 Cal.Rptr. 111, 112-13 (1968); forty-eight minutes, Commonwealth v. Schaefer, 8 Pa.Cmwlth. 96, 300 A.2d 907, 907-08 (1973); about one hour, Gaunt, 136 Ariz. at 425-28, 666 P.2d at 525-28; one hour and fifteen minutes, State v. Palmer, 291 Minn. 302, 191 N.W.2d 188, 188-92 (1971); two hours, Krueger v. Fulton, 169 N.W.2d 875, 879 (Iowa 1969).
[10] Some states sidestep this problem by establishing a specific length of time after which a refusal declaration is automatically triggered. See, e.g., Vt.Stat.Ann. tit. 23, § 1202(c) (1987 & Supp.1993):

A person who is requested by a law enforcement officer to submit to an evidentiary test has the right to consult an attorney before deciding whether or not to submit to such a test. The person must decide whether or not to submit to the evidentiary test within a reasonable time, but no later than 30 minutes from the time of the initial attempt to contact the attorney.
See also W.Va.Code, § 17C-5-7(a) (Repl.Vol. 1991).